■ ANDREW VELEZ et al., Respondents, v. CRAINE & CLARKE LUMBER CORP., Appellant.— Judgment of the Supreme Court, Kings County, entered November 29, 1971, reversed, on the law, without costs, and complaint dismissed. The findings of fact below are affirmed. Plaintiffs brought this action against the defendant lumber supply company to recover damages, on the theories of breach of warranty and negligence, for personal injuries sustained when a scaffolding plank broke under their weight and caused them to fall. At the close of the entire case at a separate trial on the issue of liability, the trial court dismissed the negligence causes of action and reserved decision on defendant's motion to dismiss the causes of action for breach of warranty. The jury found for plaintiffs on the theory of breach of warranty and at the subsequent trial on the issue of damages a different jury awarded them substantial damages. John Valentine, the job superintendent of Julius Nasso Concrete Company, plaintiffs' employer, testified that on January 27, 1970 he ordered a quantity of lumber from defendant by telephone, including 200 pieces of 2 by 9 scaffold planking, and that he specifically asked for scaffold planking. He had 20 years' experience in the trade and had dealt with defendant for 15 or 16 years; this was the normal way he gave an order and was the standard procedure for ordering. He further testified that scaffold planking was a standard item 13 feet long, suitable for scaffolding, and should be number one grade — free from any imperfections that would affect the quality of the material. Defendant's vice-president, who received the telephone order from Valentine, testified that the latter specifically asked for rough spruce planking without saying which of two available grades he wanted. This was a repeat of many orders he had received from Valentine for other jobs during the previous two or three months and Valentine did not mention scaffold planking or say what he was going to use it for. When Valentine gave him the order he wrote it down in an order book as it was given to him. This notation was received in evidence and reads "2 x 9 Spr Rgh 200/13", substantially as appears in the invoice. The trade custom and usage is to sell rough spruce as is; and defendant, which buys its lumber from a mill, does not cut or grade it in any way and does not inspect it for quality upon delivery to it. The defendant lumber yard delivered the lumber and one of Nasso's foremen checked it for quantity, not quality, and signed a receipt for it. Following the delivery, Nasso's employees branded the firm name on both edges of the planking (it was two inches thick), about a foot from one end, and then stacked it in a pile. At that time only the edges of the plank were visible. Nasso's foreman ordered planks to be brought from the first floor of the building under construction down to the C-3 level and placed side by side across steel beams. Two men took planks from the pile and passed them down, floor by floor. About five or six planks were then laid side by side over an opening, about an inch or so apart, one end of each plank resting on a concrete platform and the other on a steel beam which it overhung by a foot. Plaintiffs stepped on the scaffold at about the same time and a few seconds later the middle plank cracked, causing them to fall some 25 feet to the foundation below. After the accident, plaintiff Velez looked over and saw that the broken plank was rotted. The

plank was not produced at the trial, but the uncontroverted testimony was that it was rotted on one side with a split or egg-shaped break all the way across in the rotted area, which was about 20 inches in diameter and ran completely across the plank. This defect was visible only on one side of the plank and was hidden from view on the other side. The invoice for the lumber was received in evidence and it bears in large capital letters the legend "NO CLAIMS ALLOWED UNLESS MADE IMMEDIATELY AFTER DELIVERY". Immediately below this disclaimer appears the following: "NOTE — The purchaser shall be deemed to have accepted these goods as is, the seller having made no representations or warranties whatsoever with respect to their quality, fitness for use, or in any other regard thereto." The word "NOTE" is printed in the largest type used on the invoice, except for defendant's name at the top and the invoice number at the bottom, but the text of the disclaimer is printed in the smallest type used on the invoice. The only serious question presented on this appeal is the effect to be given to this exclusion of warranty of fitness. To be effective, an exclusion must be written and "conspicuous" (Uniform Commercial Code, § 2–316, subd. [2]). The code defines "conspicuous" as follows (§ 1–201, subd. [10]): "A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as: NON-NEGOTIABLE BILL OF LADING) is conspicuous. Language in the body of a form is 'conspicuous' if it is in larger or other contrasting type or color. But in a telegram any stated term is 'conspicuous'. Whether a term or clause is 'conspicuous' or not is for decision by the court." The trial court held that the disclaimer was not conspicuous, citing *Minikes* v. *Admiral Corp.* (48 Misc 2d 1012), where the District Court of Nassau County, First District, stated (p. 1013): "Before a merchant can disqualify for the implied warranties the public has become accustomed to, it must show that the customer was clearly placed on notice. Since the disclaimer is smaller, not larger, than the rest of the purchase order, it is not conspicuous." This holding is the subject of the following comment (18 Syracuse L. Rev., p. 290): "Although the decision is instructive to draftsmen, it is troublesome both because of omissions from the fact statement as well as the questionable handling of the statutory definition of 'conspicuous.' The statutory language seems clearly intended to be illustrative rather than exclusive. A literal reading of the statute would, in certain circumstances, permit the characterization of a disclaimer provision as conspicuous if it were in smaller rather than larger type even where it is the same color and non-contrasting. Suppose, for example, it is clearly inset, has large spaces above and below and also has large red arrows pointing to it, or a red box around it? The opinion in this case, however, indicates that any such efforts to test the meaning of the statute would be a foolish enterprise, particularly when reasonable methods for making disclaimers conspicuous are spelled out by the statute itself." We agree that the statutory language is illustrative rather than exclusive; it presents guidelines to assist the court in deciding whether a particular disclaimer of warranty is conspicuous so that the person against whom it is to operate ought to have noticed it. Each case should be judged on the basis of its own facts and the court should take into consideration the pertinent circumstances. Here the record indicates that Nasso's job superintendent, Valentine, had actual knowledge of the presence of the disclaimer of warranty of fitness for purpose on invoices in the trade. In his dealings with defendant for 15 or 16 years and in his 20 years' experience in the trade he had seen quite a few invoices. It had been his experience to see such a disclaimer on these invoices and he could not recall ever seeing one

without it. In our opinion, the trial court should have taken these circumstances into consideration together with the fact that the disclaimer appeared at the bottom of the invoice roughly opposite the total amount of the bill and immediately underneath the conspicuous legend "NO CLAIMS ALLOWED UNLESS MADE IMMEDIATELY AFTER DELIVERY". In addition, the disclaimer of warranty was preceded by the word "NOTE" which appeared in conspicuous capital letters, thus calling further attention to it. We feel these circumstances, together with Valentine's actual knowledge that invoices in the trade contain a disclaimer of warranty, rendered the disclaimer in the present case sufficiently conspicuous so that he ought to have noticed it despite the smallness of the type used. The disclaimer was conspicuous as to Valentine and, as Nasso's agent, he was the person against whom the disclaimer was to operate. We accordingly conclude that the disclaimer of warranty was effective against plaintiffs' employer Nasso and thus effectively barred plaintiffs' causes of action for breach of warranty. Martuscello, Acting, P. J., Brennan and Benjamin, JJ., concur; Gulotta, J., dissents and votes to affirm, with the following memorandum, in which Christ, J., concurs: In addition to the narrow ground on which the judgment was granted, we think it sustainable on somewhat broader grounds. Plaintiffs, who were employees of a construction company, suffered serious injuries when a scaffold plank on which they were standing broke in the middle and precipitated them about 30 feet into the basement of the building on which they were working. The plank was one of 200 purchased from defendant for the specific use to which it was put and the intended use was made known to defendant, with whom plaintiffs' employer had been dealing for some 15 or 16 years. It is a standard item made of spruce, 2 inches by 9 inches cross section by 13 feet long. It should be cut from sound lumber without excessively large knots. However, a knot was not involved in the plank which broke in this case. Rather, it was a rotted section on the under side of a brand new plank and plaintiffs' employer's brand name was stamped on the side of the plank when it was received. Neither plaintiff observed anything wrong with the upper side of the plank exposed to their view as they stepped onto it. Plaintiffs' action was based on both negligence and breach of warranty. However, only the latter issue was given to the jury by the trial court. There can be little doubt that this plank was not fit for the purpose for which it was sold and that there was a breach of the implied warranty of fitness (Uniform Commercial Code, § 2–315). Furthermore, there was also a breach of the implied warranty of merchantability (§ 2–314), since the plank lacked that medium quality of goodness to be expected in goods of that type and certainly would not have passed a thorough inspection had one been made. The only serious question presented on this appeal is the effect to be given to a disclaimer of liability for breach of warranty contained in the invoice which accompanied the delivery of the planks. Such a disclaimer is permitted by section 2–316 of the Uniform Commercial Code. However, to be effective it must be *conspicuous.* That term is defined in subdivision 10 of section 1–201 of the code as language which "is in larger or of other contrasting type or color." This disclaimer was none of these. It was in ordinary type, the smallest on the invoice — actually in 5 point type (less than 1/14 inch high) — compared to much other matter on it printed in bold face type ranging from 9 to 12 points. Thus we do not disagree with the Trial Judge's ruling that the disclaimer was legally insufficient under the code (see *Velez* v. *Crane & Clark Lbr. Corp.,* 68 Misc 2d 499). However, assuming *arguendo* that the disclaimer was proper in form, we would go further and hold it ineffective as against these plaintiffs on the additional ground that, since they were not parties to

the agreement and took no part in the discussions or negotiations which brought it about, they are not bound by it. In the days before *Goldberg* v. *Kollsman Instrument Corp.* (12 N Y 2d 432), this approach would have foundered both on the need for an underlying contract and on the need of privity of that contract between the contending parties. However, that case forthrightly abandoned the lip service being paid at the time to these doctrines by strained construction of dubious agencies, such as in the food cases, etc., when it held (p. 436): "A breach of warranty, it is now clear, is not only a violation of the sales contract out of which the warranty arises but is a tortious wrong suable by a noncontracting party whose use of the warranted article is within the reasonable contemplation of the vendor or manufacturer." Thus, it is now clear that, while an underlying sale is needed to give birth to the implied warranty, it is also now recognized that the person damaged, if he be a remote user, sues for the tortious wrong rather than in assumpsit. Viewed in this light, it is hard to see how his rights can be cut off by concessions made by the immediate purchaser. The onus now is put on the manufacturer or the vendor who puts a defective product into the stream of commerce, rather than on injured persons who are powerless to protect themselves. Most recently the *Goldberg* doctrine has been extended by all three of our sister Departments of the Appellate Division to include, within the ambit of those who may avail themselves of the warranty, nonusers who are injured as a result of a breach of the warranty (*Codling* v. *Paglia,* 38 A D 2d 154 [3d Dept.]; *Singer* v. *Walker,* 39 A D 2d 90 [1st Dept.]; *Ciampichini* v. *Ring Bros.,* 40 A D 2d 289 [4th Dept.]). In *Codling,* the plaintiff sought to recover against the *manufacturer* of an automobile which had crossed over into the wrong lane and had struck his car. It was alleged that the car had a defective steering mechanism. In affirming a jury verdict in favor of the plaintiff on the ground of a breach of the implied warranty of merchantability and fitness, the court stated (p. 158): "Where a manufacturer's product is of such a character that when used for the purposes for which it is made, it is likely to be a source of danger and injury to several people if not properly fashioned, the manufacturer, as well as vendor, is liable for breach of implied warranty to persons purchasing or using the product and to persons injured rescuing persons using the product. The law, having developed to the point where it is now clear that a breach of implied warranty involving a dangerous instrumentality is a tortious wrong, separate and distinct from a breach of the sales contract (*Goldberg* v. *Kollsman Instrument Corp., supra*), there would appear to be no logic or reason in denying a right to relief to persons injured by a defective dangerous instrumentality solely on the ground that they were not themselves a user of the instrument. The manufacturer of an automobile obviously is aware that such product will be operated on the highways in conjunction with the operation of other automobiles and that a defect in its manufacture might result in danger or injury to such other users of the highways. Manufacturers of articles which may be a source of danger to several people if not properly manufactured should not be immune from liability for breach of implied warranty, a tortious wrong, to persons injured by a defectively manufactured article, where the manufacturer could reasonably contemplate injury to such persons by reason of the defect." Following the decision in *Codling,* the First Department decided *Singer (supra),* wherein it also extended the warranty to one injured when another used a defectively made geologist's hammer. It concluded that the wrong having been established, the manufacturer should be answerable to the person who suffered the consequences of the wrong. Admittedly, the *Goldberg, Codling, Singer* and *Ciampichini* cases dealt with exten-

sions of the warranty and not with disclaimer (though it may be noted parenthetically that the standard form of contract used on all automobile new car sales with which the court is familiar disclaims all implied warranties and substitutes a very limited express warranty in place of the same and thus disclaimer was necessarily involved in *Codling,* although the point is not discussed in the opinion in that case). However, these cases are indicative of a policy and trend of giving added protection and coverage to those who are injured as a result of a breach of warranty. Therefore, it would appear to be logical to abandon some of the antiquated disclaimer of warranty rules in favor of those which are consistent with the breadth of the warranties as exemplified by the cases discussed above. Although no disclaimer of warranty was involved in *Goldberg* (or, if it was, it was not made an issue), it is inconceivable that the terms of the contract between American Airlines and Lockheed could have been invoked against the airplane passenger to defeat recovery for a tortious wrong, even if there had been a disclaimer in the purchase contract for the airplane. Our two construction workers in the instant case had as little to say about the terms on which their employer bought his supplies or equipment as the airplane passenger did. This question has been discussed, but from a somewhat different angle, in a number of cases. In *Walsh* v. *Ford Motor Co.* (59 Misc 2d 241 [an automobile case]), such a disclaimer was held to constitute an insufficient defense, in that, in limiting recovery in all events to replacement of parts and outlawing all claims for personal injuries, it was prima facie unconscionable under subdivision (3) of section 2–719 of the Uniform Commercial Code. That case was cited with approval by us in *Sarfati* v. *Hittner & Sons* (35 A D 2d 1004, affd. 30 N Y 2d 613), also an automobile case, which held such a disclaimer unconscionable and against public policy on more general grounds, presumably section 2–302 of the Uniform Commercial Code, the thrust of which is broader than section 2–719 and invalidates all unconscionable provisions of a sales contract, not merely damage limitations. In contrast, *Winant* v. *Approved Ladder & Equip. Corp.* (31 A D 2d 965, affd. 28 N Y 2d 529) held the disclaimer valid against the lessee of a ladder which had collapsed. The lessee was a partnership and the injured plaintiff one of the partners, though not the one who had signed the leasing agreement. Justice Martuscello's dissent pointed out the unfairness of holding the nonsigning partner to be bound by the exculpatory clause, but the Court of Appeals disagreed. However, a mere user would not equate to a copartner in this context and thus that case is distinguishable. There remains for discussion the question of whether the defect in this plank qualified as a latent defect and, further, whether it be necessary that it should in order to support a recovery for breach of warranty. There is no question but that under *MacPherson* v. *Buick Motor Co.* (217 N. Y. 382), the sire of all these more modern cases protecting the ultimate consumer, latency was and is a *sine qua non* in a negligence case. This was more recently expounded in *Campo* v. *Scofield* (301 N. Y. 468), which emphasizes that it is only the *hidden* or *concealed* dangers which give rise to liability in this setting. But *Campo* was a negligence case which carefully disavowed at the very outset of the opinion any intention to deal with breach of warranty because of conceded lack of privity, a necessary prerequisite in 1950 when that case was decided. In our opinion we need not decide now whether what was said there has equal application to a case like the present one. In principle it should not, because there is a vital difference between making a thing accident proof or foolproof, as *Campo* discussed, and making it to a minimum standard of goodness acceptable in the market place, as merchantability requires. Patency of a defect will cut off lia-

bility in a negligence case. It should not do so per se in a case based on breach of warranty, although it might be relevant in deciding whether a party's own carelessness was the proximate cause of his injuries rather than the breach of warranty. However, we have no hesitancy in holding in the instant case that this was a hidden defect. It was about as latent a defect as one could have in as unsophisticated a chattel as a plank. Nor do we have any hesitancy in sustaining the jury's verdict absolving plaintiffs from any contributory negligence in using the scaffold which had been provided for their use without examining it from all angles — top and bottom. Interestingly, one of the very cases relied on to formulate the *MacPherson* doctrine was a defective scaffold case, *Devlin* v. *Smith* (89 N. Y. 470 [1882]), in which a plank broke because it was nailed instead of lashed, a far more visible defect. Thus, a scaffold qualifies as a " thing of danger " as that term is used in these cases extending liability to remote users. Since the expression occurs in opinions dealing with both types of cases, it would seem to be a necessary finding in the present case. (See *Goldberg* v. *Kollsman Instrument Corp.,* 12 N Y 2d 432, 436–437, *supra,* where it was said: " In MacPherson's day enforcement required a suit in negligence. Today, we know from *Greenberg* v. *Lorenz* [9 N Y 2d 195], *Randy Knitwear* v. *American Cyanamid Co.* [11 N Y 2d 5] [*supra*] and many another decision in this and other States [see, for instance, *Henningsen* v. *Bloomfield Motors,* 32 N. J. 358, and *Thomas* v. *Leary,* 15 A D 2d 438] that, at least where an article is of such a character that when used for the purpose for which it is made it is likely to be a source of danger to several or many people if not properly designed and fashioned, the manufacturer as well as the vendor is liable, for breach of law-implied warranties, to the persons whose use is contemplated. The *MacPherson* holding was an ' extension ' of existing court-made liability law. In a sense, *Greenberg* v. *Lorenz* and *Randy Knitwear* v. *American Cyanamid Co.* [*supra*] were extensions in favor of noncontracting consumers.") This present dissent is another step in the same direction. [68 Misc 2d 499.]