Argued and submitted June 3, 1983, reversed and remanded May 9, 1984

The OREGON BANK,
*Respondent,*

*v.*

NAUTILUS CRANE & EQUIPMENT
CORPORATION,
*Appellant.*

(7908-03694; CA A24898)

683 P2d 95

Roger J. Leo, Portland, argued the cause for appellant. With him on the briefs were Malcolm J. Montague and Parks, Montague, Allen & Greif, Portland.

Gordon T. Carey, Jr., Portland, argued the cause for respondent. With him on the brief were Donald H. Marmaduke and Tonkin, Torp, Galen, Marmaduke & Booth, Portland.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

BUTTLER, P. J.

**BUTTLER, P. J.**

In this action, The Oregon Bank, as assignee, seeks recovery of an account receivable that arose out of the sale of hydraulic cranes by the bank's assignor, NCI Corporation (NCI), to defendant, a retailer of cranes. Defendant asserts affirmative defenses by way of setoff for breach of implied warranties of merchantability and fitness for a particular purpose, and for reimbursement for repair work performed under a Sales and Service Agreement. Defendant also counterclaims for general and punitive damages resulting from the bank's alleged *alter ego* control of NCI and for its improper demands on defendant for payment. The trial court granted plaintiff's motion for summary judgment, rejecting all of defendant's defenses and counterclaims as a matter of law. Defendant appeals from the resulting judgment for plaintiff. We conclude that there are genuine issues of material fact as to some, but not all, of defendant's claims and reverse and remand for further proceedings.

In 1975, plaintiff financed the operations of HCI Corporation (HCI), which manufactured specialized solid boom hydraulic cranes in Bend. In June, 1977, NCI purchased the assets and assumed the liabilities of HCI and negotiated a credit arrangement with plaintiff whereby plaintiff obtained a security interest in NCI's accounts receivable. A year later, plaintiff commenced proceedings against NCI to realize on plaintiff's security, at which time a receiver was appointed and the disputed account receivable was assigned to plaintiff.

That account arose out of HCI's and NCI's sales to defendant on an open account between October, 1974 and June, 1978. Defendant sold most of the cranes it purchased to its customers for use in the offshore oil industry. With each crane sold, HCI and NCI provided a maintenance manual that included a limited express warranty and a disclaimer of implied warranties. In December, 1977, NCI and defendant also entered into a Sales and Service Agreement (Dealer Agreement), which defined the relationship between the parties and contained a limited warranty provision.

Just before the liquidation proceedings instituted by plaintiff, defendant allegedly owed approximately $225,000 on the open account. On assuming control of NCI, the receiver refused to ship nine previously ordered cranes to defendant

until its account was paid. John Gordon, as president of defendant, paid $225,000 to induce NCI to ship the cranes. Plaintiff sent written notice to defendant in June, 1978, of the assignment of NCI's assets to it and made written demands for payment in October and November, 1978. In late November, 1978, Gordon responded by letter, stating that defendant would not pay the account, because the expenditures made in repairing defective cranes exceeded the amount owed to NCI. This action followed.

■ Defendant's several assignments of error present essentially the same legal question: whether defendant, in response to plaintiff's motion, presented genuine issues of material fact precluding the granting of plaintiff's motion for summary judgment. ORCP 47; *Seeborg v. General Motors Corporation,* 284 Or 695, 699, 588 P2d 1100 (1978). We view the record in the light most favorable to the party opposing the motion, *Stanfield v. Laccoarce,* 288 Or 659, 665, 607 P2d 177 (1980), and draw all reasonable inferences from the affidavits and depositions against the moving party, *Uihlein v. Albertson's, Inc.,* 282 Or 631, 634, 580 P2d 1014 (1978); *Yartzoff v. Democrat-Herald Publishing Co.,* 281 Or 651, 576 P2d 356 (1978), even as to those issues on which the opposing party would have the trial burden. *Seeborg v. General Motors Corporation, supra,* 284 Or at 699. We examine defendant's six assignments of error in that light.

Defendant's first assignment is that the trial court erred in granting plaintiff's motion for summary judgment on its account claim for $122,929.46, contending that material issues of fact exist as to whether the account entries were properly posted and as to whether the materials invoiced were actually shipped. Defendant further challenges NCI's failure to post repair credits, to which it claims it is entitled by way of setoff.[1]

---

[1] Defendant's claims arose out of the same transactions as the bank's claim on the account and are, therefore, by way of recoupment rather than setoff. The Supreme Court discussed the distinction between the two terms in *Rogue River Management Co. v. Shaw,* 243 Or 54, 58-59, 411 P2d 440 (1966):

"* * * Recoupment is confined to matters arising out of and connected with the transaction upon which the action is brought. 1 Bancroft, Code Pleading § 352.

■ In *Gardner & Beedon Co. v. Cooke,* 267 Or 7, 10, 513 P2d 758 (1973), the Supreme Court held that an account creditor had established a prima facie case on an account by producing the account receivable ledger cards, together with testimony that (1) the debits and credits were posted to the account card, (2) the ledger card entries were made simultaneously with the billing invoices by a business machine and (3) all materials represented by the entries had been delivered to defendant. In the present case, plaintiff presented the affidavit and deposition of Barbara LaChance, HCI and NCI's bookkeeper, who stated that she posted all invoices, charges, payments and other credits to the customer's account cards, that she mailed all prepared invoices and credit memos after posting and that the copy of the account card attached to her affidavit was accurate and was prepared in the regular course of business. Both LaChance and Colin Ackerman, the executive in charge of manufacturing and engineering for NCI, stated that both HCI and NCI prepared invoices only after goods were actually shipped. Most notably, however, defendant's president, Gordon, admitted that the figure $122,929.46 represented the balance of defendant's account with NCI, if the offsets for repairs were ignored. Having admitted the accuracy of the account, ignoring offsets, defendant's reliance on LaChance's statement that invoices "might" occasionally vary from work orders as rebutting plaintiff's *prima facie* case is misplaced. We conclude that plaintiff's evidence was sufficient to present a *prima facie* case.

The remaining question is whether defendant presented any evidence to support its defense that it was entitled to credits for repairs made on cranes. The affidavit of Gordon states that NCI repeatedly authorized defendant's on-site corrective work on defective cranes and assured Gordon that defendant's account would be credited for labor and materials. Those facts were confirmed by Ackerson, who added that when he received photocopies of defendant's account cards, they did not reflect the credits to which defendant was entitled.

---

" 'Set-off' is not synonymous with recoupment only in that it is a 'money demand by the defendant against the plaintiff arising upon contract and constituting a debt *independent of and unconnected with the cause of action* set forth in the complaint. Waterman, Set-Off (2 ed.) § 9.' * * *" (Emphasis in original.)

Plaintiff submitted no affidavits disputing those facts, contending that it need not do so, because *Gardner & Beedon v. Cooke, supra,* requires only that the account creditor post those credits that have actually been issued. Although plaintiff is correct as to the requirements for a *prima facie* case, when a defendant interposes and presents evidence in support of an affirmative defense by way of setoff, the fact that credits were not actually issued is no response. The question is whether they should have been,[2] which depends on whether, as a matter of law, defendant is entitled to assert defenses based on breaches of two implied warranties covered in the second and third assignments.

In those two assignments, defendant claims that the trial court erred in granting plaintiff's motion for summary judgment on its defenses based on breach of implied warranties of merchantability[3] and fitness for a particular purpose.[4]

---

[2] Because we conclude, *infra,* that defendant may be entitled to setoff amounts owing for repair work if it can establish a waiver of warranty disclaimers and breach of implied warranties, we express no opinion as to whether defendant properly raised a right to setoff based on any other theory.

[3] The implied warranty of merchantability arises with regard to goods sold within the state of Oregon pursuant to ORS 72.3140:

"(1) Unless excluded or modified as provided in ORS 72.3160, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. * * *

"(2) Goods to be merchantable must be at least such as:

"(a) Pass without objection in the trade under the contract description; and

"(b) In the case of fungible goods, are of fair average quality within the description; and

"(c) Are fit for the ordinary purposes for which such goods are used; and

"(d) Run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

"(e) Are adequately contained, packaged and labeled as the agreement may require; and

"(f) Conform to the promises or affirmations of fact made on the container or label if any.

"(3) Unless excluded or modified as provided in ORS 72.3160 other implied warranties may arise from course of dealing or usage of trade."

[4] The implied warranty of fitness arises under ORS 72.3150:

"Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the

Plaintiff relied on the express warranties furnished by NCI with each crane and the substantially identical disclaimer clause contained in the Dealer Agreement to defeat defendant's claims.[5] Defendant acknowledges the disclaimer, but contends that: (1) NCI waived the disclaimer; (2) plaintiff, as assignee of NCI, is estopped from asserting the disclaimer; (3) the disclaimer in the Dealer Agreement is void, because the agreement was executed under duress, and (4) the disclaimer

---

seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under ORS 72.3160 an implied warranty that the goods shall be fit for such purpose."

[5] The service manual contained the following limited warranty:

"NCI CORPORATION, Nautilus Crane Division, warrants its products to be free from defects in material and workmanship under normal use in service for a period of ninety (90) days after being placed in use by dealer or user and within one year from shipment from factory. Within the warranty period, the Company will replace, F.O.B. its factory, or allow credit, at the then current dealer net price, for any part that shall be proven defective, to the satisfaction of the Company. Upon the Company's request, all parts claimed defective must be properly identified and returned to the factory with charges prepaid. This policy makes no allowance for freight, travel expense or labor. NCI CORPORATION, Nautilus Crane Division, will honor properly documented and described warranty claims only on units for which an adequate Validation Form is in the Company's possession at the time when such claim is filed.

"This Warranty is expressly in lieu of any other warranties, expressed or implied, including any implied warranty of merchantability or fitness for a specific purpose, and of any other obligations or liabilities on the part of NCI CORPORATION, Nautilus Crane Division. No one is authorized to assume, for or on behalf of the Company any different or additional obligations in connection with the product. The Company's liability under this Warranty is limited to treatment of parts as set forth in paragraph one and all other liabilities expressed or implied, arising under statute, through neglect or otherwise are hereby expressly waived."

The Dealer Agreement entered into between defendant and NCI provides, in pertinent part:

"12. LIMITED WARRANTY. Dealer understands and agrees that NCI extends only that limited warranty as provided by NCI. This warranty is expressly in lieu of any other warranties, expressed or implied, including any implied warranty of merchantability or fitness for a particular purpose and of any other obligations or liabilities on the part of NCI."

Disclaimers of implied warranties (as in the "Product Warranty" above) and exclusion or limitation of remedies clauses (as in the Dealer Agreement, clause 12) are substantially identical, *K-Lines v. Roberts Motor Co.*, 273 Or 242, 541 P2d 1378 (1975), and may be considered together.

is unconscionable. We consider each of those arguments separately.[6]

Defendant argues that a course of performance was established between it and NCI, whereby the latter waived the disclaimer provisions by continually authorizing repair work exceeding the scope of the limited warranty. Plaintiff contends that, as a matter of law, a written disclaimer of implied warranties may not be waived by a course of performance. ORS 72.2080 provides:

"(1) Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.

"(2) The express terms of the agreement and any such course of performance, as well as any course of dealing and usage of trade, shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable, express terms shall control course of performance and course of performance shall control both course of dealing and usage of trade.

"(3) Subject to the provisions of ORS 72.2090 on modification and waiver, such course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance."

Although the language of subsection (2) that express terms shall control course of performance lends credence to plaintiff's argument, subsection (3) specifically provides that a course of performance is relevant to show a waiver of any term *inconsistent* with that course of performance. White and Summers, *Uniform Commercial Code,* §§ 3-3 (2d ed 1980), conclude that "the provision that express terms control

---

[6] We note that defendant's claims may be barred in part by ORS 80.020, which provides:

"In the case of an assignment of a thing in action, an action or suit by the assignee is without prejudice to any setoff or defense existing at the time of, or before notice of the assignment * * *."

However, because plaintiff concedes that at least some of defendant's claims existed prior to the notice of assignment, we do not decide which of defendant's claims, if any, are barred.

inconsistent course of dealing and its cohorts cannot be taken at face value." ORS 72.2090(4) also provides that, although an attempt at modification or rescission does not satisfy the Statute of Frauds, it may operate as a waiver. Courts consistently have relied on those provisions in holding that express terms, including anti-waiver clauses, may be waived by a course of performance inconsistent with those terms. *See, e.g., Westinghouse Credit Corp. v. Shelton,* 645 F2d 869 (10th Cir 1981).

■ In addition, the UCC provisions relating to implied and express warranties lend support to a rule of law that would allow a course of performance to override warranty disclaimers. ORS 72.3140(3) provides that, unless excluded or modified, implied warranties may arise through course of dealing or usage of trade. ORS 72.3160(3)(c) provides that implied warranties may be excluded or modified by a course of performance or usage of trade. If, as some courts have held, a course of performance may operate to disclaim an implied warranty,[7] and because disclaimers of warranties are themselves disfavored,[8] we see no reason why a course of performance may not operate to waive a disclaimer, thereby

---

[7] *See, e.g., Country Clubs, Inc. v. Allis-Chalmers Manufacturing Co.,* 430 F2d 1394 (6th Cir 1970) (course of dealing and performance sufficient to exclude implied warranties because parties discussed and negotiated limited warranty provisions and buyer asserted several claims under provisions); *Velez v. Crane & Clarke Lumber Co.,* 41 AD2d 747, 341 NYS 2d 248 (1969), *rev'd on other grounds* 33 NY 2d 117, 350 NYS 2d 617, 305 NE2d 750 (1973) (upholding nonconspicuous disclaimer in invoices where dealings between parties showed that invoices had contained clause for the past 15 years).

[8] *See, e.g.,* ORS 72.3160(1) and (2), which provide:

"(1) Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of ORS 72.2020 on parol or extrinsic evidence negation or limitation is inoperative to the extent that such construction is unreasonable.

"(2) Subject to subsection (3) of this section, to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that 'There are no warranties which extend beyond the description on the face hereof.' "

reinstating the warranties of merchantability and fitness for a particular purpose implied by law.[9] We conclude that it may do so, and turn to the question whether defendant presented a genuine issue of material fact as to the waiver that would preclude the entry of a summary judgment.

A waiver is an intentional relinquishment of a known right. *Waterway Terminals v. P.S. Lord*, 242 Or 1, 26, 406 P2d 556 (1964). In his affidavit, Gordon stated that he was authorized by NCI to do on-site corrective work, that he was told that credit would be given on defendant's account for both labor and materials and that no one at NCI ever stated that the company would not honor the claims because of the Dealer Agreement or limited customer warranty. In his affidavit, Ackerson stated:

> "* * * I have reviewed the Dealer Agreement entered into in December of 1977 between NCI and the defendant, Nautilus Crane & Equipment Corporation. This agreement does not accurately state the business relationship between NCI and Nautilus, which was consistently handled on a considerably less formal basis than would appear from the Agreement. Because Nautilus was NCI's leading customer, transactions between NCI and Nautilus were handled on a common sense basis, taking into account business realities, including the mutual need of both NCI and Nautilus to correct the numerous malfunctions and faults which occurred in marine cranes and components fabricated and supplied by NCI to Nautilus. Over the period of time leading up to my arrival at the company, and during my presence there, Nautilus developed our company's leading market for marine cranes, so if we shipped something defective, it was company policy to make good the defects. * * *"

Ackerson also stated that he was in contact with Gordon on the average of three times a week from February, 1977, through October, 1978, and that

---

[9] One commentator has stated that sellers who are concerned that gratuitous services rendered may operate as a waiver of disclaimer clauses should include in the contract the following provision:

> "If the seller, at its option, agrees to a waiver of any of the terms and conditions recited herein, such waiver shall not for any purpose be construed as a waiver of any succeeding breach of the same or any other terms or conditions of said contract; nor shall such a waiver be viewed as a course of performance."

Tracy, *Disclaiming and Limiting Liability for Commercial Damages*, 83 Com. L.J. 8, 20 (1978).

"* * * neither the express warranty nor the Dealer Agreement were ever actually implemented * * * to prevent Nautilus [Crane & Equipment Company] from making labor and material backcharges on their account for authorized repair and correction work. * * *"

Ackerson also confirmed Gordon's statement that "it was not regular practice for either NCI or Nautilus to document it by written authorization or by memoranda."

Because the repair work was not so documented and because Gordon and Ackerson admitted that they never discussed the limited warranty or the Dealer Agreement, plaintiff argues that the facts presented cannot as a matter of law constitute a course of performance sufficient to waive the written warranty provision. However, reasonable minds could draw different inferences from those facts, and we cannot say as a matter of law that defendant did not present sufficient facts to permit the fact finder to infer that NCI intentionally relinquished its rights under the limited warranty and disclaimer provisions. Accordingly, it was error to grant summary judgment on this issue.

Defendant contends that NCI's change of position regarding the applicability of the terms of the product warranty and Dealer Agreement estops plaintiff from now asserting those terms. Under Oregon law, for an equitable estoppel or estoppel by conduct, (1) there must be a false representation made with knowledge of the facts, (2) the other party must be ignorant of the facts, (3) the representations must be made with the intent that they be acted upon and (4) the other party must be induced to so act. *Bash v. Fir Grove Cemeteries Co.,* 282 Or 677, 687, 581 P2d 75 (1978); *Donahoe v. Eugene Planing Mill,* 252 Or 543, 545, 450 P2d 762 (1969); *Hess v. Seeger,* 55 Or App 746, 760-61, 641 P2d 23, *rev den* 293 Or 103 (1982).

Even if it could be said that a false representation was made on which defendant was induced to act, defendant has presented nothing in opposition to plaintiff's motion to indicate that it was ignorant of the written disclaimer and limited warranty provisions. To the contrary, Gordon admitted to having signed the Dealer Agreement, which, along with the maintenance manuals containing the limited warranty provisions, were available to him at all times. As the court

stated in *Shaw v. Northwest Truck Repair,* 273 Or 452, 457, 541 P2d 1277 (1975):

> "[I]t is well established that there can be no estoppel unless there was not only reliance, but a right of reliance, and that reliance is not justified where a party has knowledge to the contrary of the fact or representation allegedly relied upon. * * *"

*See also Willis v. Stager,* 257 Or 608, 619, 481 P2d 78 (1971). Defendant failed to raise an issue of material fact on its estoppel defense.

■ Defendant further seeks to avoid the terms of the Dealer Agreement by arguing that it entered into the agreement under duress. The only evidence presented to support this allegation is the affidavit of defendant's president, Gordon, in which he stated:

> "In December of 1977, Mr. Brian Ball, a vice president of NCI, came to our company offices in Metairie, Louisiana, for a customer visit. He presented me with a 'Dealer Agreement,' which I now understand is asserted by NCI's assignee, The Oregon Bank, as a defense against the $190,000.00 worth of labor and material charges which were still outstanding when NCI closed its doors. I initially refused to sign it, and finally did so only out of duress, because Mr. Ball told me that if I did not sign it, NCI would sell me no more cranes, which would have put our company out of business."

■ Duress is an unlawful constraint exercised on a person whereby he is forced to do some act against his will. *Horn v. Davis,* 70 Or 498, 505, 142 P 544 (1914). The present case involves a species of duress commonly referred to as economic duress or business compulsion. *See, e.g., Capps v. Georgia-Pacific,* 253 Or 248, 453 P2d 935 (1969). Whether particular facts are sufficient to constitute a defense of economic duress or business compulsion is a matter of law for the courts, while the question of whether the facts alleged actually exist is a matter for the jury. *See, e.g., Jamestown Farmers Elevator, Inc., v. General Mills,* 552 F2d 1285, 1290 (8th Cir 1977).

■ There are three elements to a *prima facie* case of economic duress: (1) wrongful acts or threats; (2) financial distress caused by the wrongful acts or threats, and (3) the absence of any reasonable alternative to the terms presented

by the wrongdoer. *Sonnleitner v. C.I.R.*, 598 F2d 464, 468 (5th Cir 1979); Calamari & Perillo, *Contracts* § 9-2 (2d ed 1977). Here, defendant has alleged only that NCI threatened to cease doing business with it if Gordon did not sign the agreement and that defendant would have gone out of business but for NCI's supply of cranes. It is well established, however, that threats to do what the threatening person had a legal right to do does not constitute duress. *Wurtz v. Fleischman,* 97 Wis 2d 100, 293 NW2d 155, 160 (1980). Here, defendant has failed to assert facts that would support the legal conclusion that NCI had an obligation to continue to supply cranes to defendant. Even assuming that NCI had such an obligation, however, defendant has failed to allege that it had no other alternative than to sign the contract, that it could not obtain cranes from another source or that its legal remedies for breach of contract were insufficient. A threatened breach of contract for which there are adequate legal remedies does not constitute duress. *Neuman v. Pike,* 591 F2d 191 (2d Cir 1979). The trial court did not err in concluding that defendant's duress defense is not supported as a matter of law.

 In its fourth amended answer and counterclaim, defendant alleges that the Sales and Service Agreement

"*** purport[s] to limit remedies of Defendant in a manner which causes the agreement to fail of its essential purposes, by reason of which it is void for unconscionability."

Although defendant appears to have considered them one and the same, unconscionability and failure of essential purpose are distinct legal theories that need to be examined separately.

ORS 72.3020 provides:

"(1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

"(2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination."

Although the UCC does not define unconscionability, the official comment to the code suggests the following standard, which the Supreme Court adopted in *W. L. May Co. v. Philco-Ford Corp.*, 273 Or 701, 707, 543 P2d 283 (1975):

> · " "* * * *The basic test is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract.* * * * The principle is one of the prevention of oppression and unfair surprise (*cf. Campbell Soup Co. v. Wentz*, 172 F.2d 80, 3d Cir. 1948) and not of disturbance of allocation of risks because of superior bargaining power.' Uniform Commercial Code § 2-302, Comment 1." (Emphasis in original.)

The court also pointed out that unconscionability is an issue of law to be decided by the court and that the party asserting unconscionability must demonstrate that the contract was unconscionable at the time it was made.

■ Defendant's argument is confusing, but appears to be that the agreement is unconscionable because it contains a limited product warranty and also allegedly imposes an obligation on defendant to perform repair work without compensation. The type of limited warranty and disclaimer clauses contained in the agreement has been upheld consistently by courts as permissible between businesses dealing in a commercial setting. *See Tokio Marine & Fire Ins. v. McDonnell Douglas Corp.*, 617 F2d 936 (2d Cir 1980); *K-Lines v. Roberts Motor Co.*, 273 Or 242, 253, 541 P2d 1378 (1975); *Atlas Mutual Ins. v. Moore Dry Kiln*, 38 Or App 111, 114, 589 P2d 1134 (1979). Thus, in order to find that the agreement is unconscionable, we must conclude that it obligates defendant to perform repair work free of charge. Because we do not so interpret the agreement (*see* discussion of paragraph 5H, *infra*, at 16-18), defendant fails to demonstrate that the agreement is unconscionable as a matter of law.

■ Defendant also fails to assert sufficient facts to support a defense that the limited warranty fails of its essential purpose. ORS 72.7190(2) provides:

> "Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in the Uniform Commercial Code."

Defendant does not state how the disclaimer fails of its essential purpose or specify the circumstances under which the remedy fails. There was no error in concluding that defendant had no defense on either theory.

In its fourth assignment, defendant contends that the trial court erred in granting summary judgment for plaintiff on defendant's claim that it was entitled to reimbursement under paragraph 5H of the Dealer Agreement for various repairs authorized by NCI. That agreement provides that defendant has the non-exclusive right to sell NCI's cranes in the states of Texas, Louisiana, Mississippi and Alabama. The disputed portions of the agreement are as follows:

"5. DEALER OBLIGATIONS

"* * * * *

"B. Dealer agrees to install, repair and perform all normal servicing with respect to all products and parts sold or otherwise supplied to a customer by Dealer in its territory.

"C. Dealer agrees to perform all service and other work required under NCI's warranty with respect to all products and parts sold or otherwise supplied to a customer by Dealer in its territory unless written authorization is given Dealer by NCI to return product to NCI for factory repair.

"* * * * *

"H. Dealer agrees, upon request to NCI, to render services required in Section 5, paragraphs B and C, with respect to any product or part sold, rented or loaned by NCI for use in Dealer's territory. NCI agrees to pay Dealer reasonable compensation for such services."

Plaintiff argues that, because NCI retained the right to sell cranes and products directly to certain customers, paragraph 5H clearly provides that, upon request to NCI by its customers, defendant would install, repair and perform warranty work on cranes sold, rented or loaned by NCI and would be compensated for so doing. Defendant, on the other hand, submits that paragraph 5H is ambiguous at best and that the affidavits of Gordon and Ackerson, which detail a course of performance between NCI and defendant, support its interpretation of 5H as providing a source of reimbursement for all repairs.

■ As a general rule, the construction of a contract is a question of law. *Timberline Equip. v. St. Paul Fire and Mar. Ins.*, 281 Or 639, 643, 576 P2d 1244 (1978), *May v. Chicago Insurance Co.*, 260 Or 285, 292-94, 490 P2d 150 (1971). However, if the court determines that language of the contract is ambiguous, or if technical words, local phrases or terms of art are used, and evidence is properly admitted showing what the parties intended, their intention becomes a question of fact. *Timberline Equip. v. St. Paul Fire and Mar. Ins., supra,* 281 Or at 643; *Libby Creek Logging, Inc. v. Johnson,* 225 Or 336, 339, 358 P2d 491 (1960).

■■ The provision before us is unambiguous. The trial court correctly noted that defendant's interpretation would render the first sentence of paragraph 5H meaningless. A construction of an agreement that renders any part of it meaningless should be avoided. *Moore v. Schermerhorn,* 210 Or 23, 31, 307 P2d 483, 308 P2d 180 (1957). We conclude that the trial court correctly interpreted the Dealer Agreement and that there is no question of fact presented as to its meaning.

In its fifth and sixth assignments, defendant contends that the trial court erred in granting plaintiff's motion for summary judgment on defendant's claim, asserted both as a setoff and as a counterclaim, that the bank was the alter ego of NCI, as a result of which plaintiff's account is subject to a setoff or plaintiff is liable to defendant for damages incurred as a result of the bank's demands on defendant for payment of its account with NCI. The gravamen of these contentions is that the bank not only placed NCI into receivership, but thereafter manipulated its business relationship with defendant without reference to NCI's obligation to reimburse defendant for repair work. Defendant relies solely on *Credit Managers Ass'n of So. Cal. v. Superior Court,* 51 Cal App 3d 355, 124 Cal Rptr 242 (1975), to support its claim.

In that case, an assignee for the benefit of creditors of a corporation brought an action against a lender bank and a consultant, alleging that the bank had compelled the corporation to hire the consultant to implement strict credit, sales and inventory policies, which ultimately resulted in the corporation's insolvency. The plaintiff alleged that through their actions the defendants had assumed and breached fiduciary duties of good faith and fair dealing toward the corporation.

After concluding that the plaintiff had not alleged sufficient facts to entitle it to undertake discovery under California law, the trial court granted the defendant a protective order. In reversing the respondent court, the appellate court stated:

> "* * * Under such circumstances in our view a trial court could properly conclude that [defendant consultant] had the same fiduciary obligation to [the corporation] and its creditors and to the stockholders of [the corporation] that the officers and directors of [the corporation] would have had to such creditors and such stockholders. Directors of a corporation are trustees of the stockholders and indirectly for the creditors." 124 Cal Rptr at 247. (Citations omitted.)

Defendant appears to argue that the bank had a duty to NCI and to defendant as NCI's creditor.[10] Even if we were to recognize a cause of action based on the theory expounded in *Credit Managers,* this case is not an appropriate vehicle for doing so. Defendant has presented no facts indicating that the bank ever controlled or managed NCI or that it acted contrary to the manner in which any other secured creditor might act after determining that its security was in jeopardy. Here, unlike *Credit Managers,* the bank did not seek a role in managing the corporation, but rather filed suit to appoint a receiver, which it had the legal right to do. Defendant has failed to state sufficient facts to constitute a cause of action within the theory of *Credit Managers,* or any other theory.

In conclusion, because there are genuine issues of material fact as to whether defendant is entitled to credits for repairs by way of setoff to plaintiff's account if defendant is able to establish a waiver of the limited warranty and disclaimer provisions, we reverse in part and remand for trial on those issues.

Affirmed in part; reversed in part, and remanded for further proceedings not inconsistent with this opinion.

---

[10] Defendant must base its contention that it was a creditor of NCI on its claims for repair expenses under the various theories discussed.