Argued and submitted August 30, 2006, reversed and remanded March 28, 2007

## COMCAST OF OREGON II, INC.,
*Plaintiff-Appellant,*

*v.*

## CITY OF EUGENE,
an Oregon municipal corporation,
*Defendant-Respondent.*

Lane County Circuit Court
160307308; A126445

155 P3d 99

Duane A. Bosworth argued the cause for appellant. With him on the briefs were Kevin H. Kono and Davis Wright Tremaine LLP.

Jerome Lidz argued the cause for respondent. With him on the briefs were Ross M. Williamson and Harrang Long Gary Rudnick P. C.

Before Brewer, Chief Judge, and Schuman and Rosenblum, Judges.

ROSENBLUM, J.

## ROSENBLUM, J.

Plaintiff brought this action, seeking a declaratory judgment declaring that certain permit fee schedules enacted by defendant City of Eugene (the city) were invalid and seeking to recover part of the money that it had paid for permits under those fee schedules.[1] The parties filed cross-motions for summary judgment. The city asserted that the fee schedules were validly enacted; that, even if they were not, plaintiff had paid the fees voluntarily and thus was not entitled to recover them; and that, in any event, plaintiff had failed to comply with notice requirements under the Oregon Tort Claims Act (OTCA) before commencing the action. The trial court rejected the city's OTCA argument and ruled that plaintiff had paid the fees under duress, but it concluded that the fee schedules were validly enacted. It therefore entered judgment in the city's favor. Plaintiff appeals, arguing that it, not the city, was entitled to summary judgment. The city cross-assigns error to the trial court's ruling under the OTCA and to its ruling that plaintiff paid the fees under duress. We conclude that the fee schedules were not validly enacted, because the city manager did not consider the amounts charged for similar permits in other jurisdictions, and that plaintiff was thus entitled to summary judgment on its declaratory judgment claim. However, we also conclude that issues of fact remain on the question of duress; we therefore remand for further proceedings on that issue.

Before we recite the pertinent facts of the case, we pause to elucidate the scope and standard of our review of the facts. As noted, both parties moved for summary judgment on the same issues and plaintiff assigns error to the grant of the city's motion and to the denial of its own motion. Under the circumstances, both rulings are reviewable. *Brock v. State Farm Mutual Auto. Ins. Co.*, 195 Or App 519, 521, 98 P3d 759 (2004). Each moving party has the burden of demonstrating that there are no material issues of fact and that the moving

---

[1] In its complaint, plaintiff also sought a writ of review of the two orders enacting the fee schedules. The trial court dismissed the writ of review on the ground that the orders were legislative enactments, which are not subject to writ of review. On appeal, plaintiff assigns error to that ruling. We reject that assignment of error without discussion.

party is entitled to judgment as a matter of law. *Eden Gate, Inc. v. D&L Excavating and Trucking, Inc.*, 178 Or App 610, 622, 37 P3d 233 (2002). In regard to each motion, we view the evidence and all reasonable inferences that can be drawn therefrom in the light most favorable to the nonmoving party. *Brock*, 195 Or App at 521. In this case, the facts are largely undisputed. For present purposes, except where noted otherwise, we state the facts neutrally. Later in this opinion, where necessary, we will explain what inferences can be drawn in each party's favor.

Plaintiff has a franchise agreement with the city to provide cable services. In June 2001, plaintiff and the city entered into an agreement under which plaintiff would, by June 30, 2003, complete a city-wide upgrade of its cable facilities, which required installation of a significant amount of new cable, some underground and some aerial. The agreement provided for penalties for failure to timely complete the upgrade:

> "In the event the upgrade is not completed and activated by June 30, 2003 without just cause, [plaintiff] will provide to the City a one-time payment of $25,000.00 in addition to the franchise fees due and payable to the City for the year 2004 and the City may pursue its enforcement remedies under the current franchise including Section 15 - Resolution of Disputes, Section 19 - Penalties, and Section 16 (3) - Termination."

The city requires utilities to obtain construction permits for work done in a public right of way, so plaintiff was required to obtain a number of permits for the upgrade project. The fees that the city charged for those permits form the basis of this dispute.

Eugene Code (EC) 7.300(1) provides that the fee for a permit for work affecting a public way "shall be set by the city manager pursuant to section 2.020 of this code in an amount sufficient to fully recover all of the City's costs related to processing the application for the permit and inspecting the work during and after completion of the work." EC 2.020, in turn, provides procedures by which the city manager or his designee is to determine and set all fees imposed by the city for "services, goods, use of municipal

property, licenses and permits." Subsection (2) sets forth five factors that the city manager "shall consider," including the "full costs of providing the service supported by the fee" and the "amounts charged by other comparable providers." Subsections (3) through (5) provide for public notice of a proposed fee, a period for receiving written comments, and recording of administrative orders setting fees.

The fee that the city charges for a given utility permit is determined, in part, by the length of the utility project. However, before January 2002, the applicable fee schedule capped fees at the amount charged for a 1,000-foot project—in other words, all other factors being equal,[2] the fee for a 10,000-foot project was the same as the fee for a 1,000-foot project.

In 2001, city staff responsible for issuing utility permits determined that permit fees were not covering processing and inspection costs. To come into compliance with EC 7.300(1), the staff—headed by Utility Permit and Inspection Supervisor Damon Joyner—developed a new fee schedule. The new schedule raised the fee rates and eliminated the 1,000-foot cap. Evidence in the summary judgment record indicates that Joyner considered a number of factors in setting the fees, including the amount of money budgeted for the permitting program, the time spent by involved staff members on permit-related activities, the average number of permits issued annually, and the revenues that the new fee schedule would generate in an average year.

With respect to the requirement in EC 2.020(2)(d) that the city manager consider "[t]he amounts charged by other comparable providers," Joyner concluded that the fees charged for similar permits in other jurisdictions were irrelevant in light of the specific directive to establish fees in an amount that would recover the city's costs. Thus, he did not obtain any specific information about other jurisdictions' fee schedules.

---

[2] Two other variables also determined the fee for any given permit: (1) whether the installation was on a local or arterial street and (2) the number of "facilities" installed—in other words, the number of different underground utilities installed in a single trench.

Joyner delivered the proposed new fee schedule to the city manager, and, in December 2001, the city published notice of a proposed order adopting the new schedule. The notice provided that the city would accept written comments on the proposed order for a 30-day period, but the city received no comments. On January 30, 2002, by Administrative Order 58-01-18-F (the 2002 order), the city manager adopted the new schedule.

Five months later, in June 2002, plaintiff sent the city a letter complaining about the new permit fees. Plaintiff objected to having to obtain permits for aerial installations, which, it contended, the city had never required before. Plaintiff also argued, among other things, that the fees for such permits violated EC 7.300(1) because they greatly exceeded the city's costs associated with inspecting aerial installations. In other correspondence with the city, plaintiff asserted that, as a result of the new fee schedule, the total cost of permits that it would have to obtain for the upgrade project would be approximately $360,000, rather than $10,000 to $15,000, as plaintiff had originally anticipated.

In response to plaintiff's letter and other complaints that the city received about the new fees, the staff developed a revised fee schedule under which aerial installations over five miles in length would be charged a lower rate. For aerial installations up to five miles in length, the rates set in the 2002 order would continue to apply. In February 2003, the city manager issued Administrative Order 58-02-29-F (the 2003 order), adopting the reduced rate and ratifying the other rates established in the 2002 order.

Plaintiff continued the upgrade project, paying the permit fees under protest. It completed the project on April 29, 2003, two months ahead of the deadline. By then, plaintiff had paid approximately $375,000 for permits associated with the project.

On April 21, 2003, plaintiff initiated this action. Plaintiff sought a declaration that the fee schedules adopted in the 2002 and 2003 orders violated EC 2.020(2) and EC 7.300(1); in a separate claim for money had and received, it

sought damages in the amount that the city allegedly over-charged for permits. The parties filed cross-motions for summary judgment on both the declaratory judgment claim and the money had and received claim. The city argued in support of its motion that plaintiff's claims with respect to the 2002 order were barred because plaintiff failed to prove that it had given tort claims notice in compliance with the Oregon Tort Claims Act insofar as its claims were aimed at the 2002 order. *See* ORS 30.275(1) ("No action arising from any act or omission of a public body or an officer, employee or agent of a public body within the scope of [the OTCA] shall be maintained unless notice of claim is given as required by this section."). On the merits, the city argued that the 2002 and 2003 orders were both validly enacted. The city also contended that, even if the orders were not valid, plaintiff was not entitled to a refund of the permit fees because it had paid them voluntarily.

In support of its summary judgment motion, plaintiff argued that both orders were invalid because they were not enacted in compliance with EC 2.020(2) and EC 7.300(1). According to plaintiff, the city manager failed to comply with EC 2.020(2) because he did not consider the fees that other jurisdictions charge for similar permits. Plaintiff also contended that the city's authority to set permit fees is limited by EC 7.300(1) to setting fees in an amount no greater than necessary to recover the city's costs associated with issuing a permit and inspecting the permitted work. Plaintiff pointed to undisputed evidence that the revenues from permits issued during the time that it was completing the upgrade project greatly exceeded the city's costs. Plaintiff contended that the excess resulted from the fact that, in setting the permit fees, the city manager had failed to consider the revenues that it would receive as a result of lifting the 1,000-foot cap and of requiring permits for aerial installations.

The trial court issued a letter opinion in which it ruled on the parties' motions:

> "The Court has decided to grant the City's Motion for Summary Judgment. That is based upon reasons other than the claim that [plaintiff] was not under duress in the payment of fees. The Court finds that the circumstances did

amount to duress and that the plaintiff would have been entitled to recover monies paid had it otherwise prevailed. In addition, the Court does not find sustainable the Defendant City's claim that the Plaintiff failed to abide by the Oregon Tort Claims Act."

The court entered judgment in the city's favor.

On appeal, plaintiff contends that the trial court erred in granting the city's motion for summary judgment and in denying plaintiff's motion. Plaintiff renews the arguments that it made before the trial court. The city cross-assigns error to the trial court's ruling that plaintiff did not run afoul of the notice provisions of the OTCA. The city also cross-assigns error to the court's ruling that plaintiff paid the permit fees under duress.

The city's first cross-assignment of error raises a jurisdictional issue, so we begin by addressing it. The city contends that, with respect to the 2002 order, plaintiff's claims for declaratory judgment and for money had and received are tort claims within the meaning of the OTCA.[3] Plaintiff did not plead in its complaint that it had given the city notice of its claims. Consequently, according to the city, both the trial court and this court lack jurisdiction to hear the claims. *See Johnson v. Smith*, 24 Or App 621, 626, 546 P2d 1087 (1976) (failure to plead notice deprives courts of jurisdiction over tort claims against public bodies).[4]

---

[3] In the city's view, plaintiff's claims with respect to the 2003 order also constitute tort claims, but the city concedes that plaintiff's complaint itself satisfied the OTCA notice requirement with respect to those claims. *See* ORS 30.275(3)(c) (notice of claim is satisfied by commencement of an action on the claim within the prescribed period of time).

[4] In *Robert Randall Co. v. City of Milwaukie*, 32 Or App 631, 633, 575 P2d 170 (1978), we noted that it is arguable that our conclusion in *Johnson*—that failure to plead notice is a jurisdictional defect—is "subject to question." *See also Adams v. Oregon State Police*, 289 Or 233, 236 n 4, 611 P2d 1153 (1980) (noting that whether pleading notice is a jurisdictional requirement remains an open question in the Supreme Court); *Urban Renewal Agency v. Lackey*, 275 Or 35, 40, 40 n 4, 549 P2d 657 (1976) (expressly declining to decide the issue). We did not reexamine the issue in *Robert Randall Co.* because the parties did not raise or brief the question and, moreover, its resolution would not have changed the result in that case. Likewise, in this case, the parties have not briefed that issue, and overruling *Johnson* would not lead to a different result. Accordingly, we decline to revisit the issue.

■    We first consider the city's argument with respect to plaintiff's declaratory judgment claim. ORS 30.260(8) defines "tort," for purposes of the OTCA, as

> "the breach of a legal duty that is imposed by law, other than a duty arising from contract or quasi-contract, the breach of which results in injury to a specific person or persons for which the law provides a civil right of action for damages or for a protective remedy."

The city contends that plaintiff's declaratory judgment claim alleges a tort because (1) it alleges a breach of a legal duty that is imposed by law—namely, the duty imposed by EC 7.300(1) to limit permit fees to the amount needed to recover the city's costs; (2) it alleges that the breach of that duty resulted in injury to plaintiff; and (3) a declaratory judgment is a "protective remedy."

■    We need not decide whether plaintiff's declaratory judgment claim alleges a tort as that term is defined in ORS 30.260(8). Even if it does, it is not a claim for which notice must be given under ORS 30.275. As the Supreme Court explained in *Krieger v. Just*, 319 Or 328, 337, 876 P2d 754 (1994), notice under ORS 30.275 is required only for claims "made possible and authorized by" the OTCA, not for previously existing claims—that is, notice is required only for claims that were previously barred by sovereign immunity. *See Jensen v. Whitlow*, 334 Or 412, 416, 51 P3d 599 (2002) ("In 1967, the legislature passed the Oregon Tort Claims Act (OTCA), which abrogated, in part, the state's sovereign immunity."). Declaratory judgment claims asserting that governmental enactments are invalid were "possible and authorized" well before the OTCA was enacted. *See Hanson v. Mosser*, 247 Or 1, 7, 427 P2d 97 (1967), *overruled on other grounds by Smith v. Cooper*, 256 Or 485, 475 P2d 78 (1970) (declaratory judgment actions against the state alleging invalidity of state acts are not barred by sovereign immunity, so the state's consent to be sued is not required); *see also, e.g., Terry v. City of Portland et al*, 204 Or 478, 269 P2d 544 (1954) (considering validity of city ordinance challenged in declaratory judgment claim). It follows that plaintiff was not required to give notice of its declaratory judgment claim under ORS 30.275.

■ We turn to the city's argument with respect to plaintiff's claim for money had and received. ORS 30.260(8) specifically defines a tort as a breach of duty imposed by law *other than a duty arising from contract or quasi-contract.* The city concedes that a claim for money had and received is "generally termed a quasi contract claim." It argues, nevertheless, that plaintiff's claim is expressly based on the legal duty imposed on the city by EC 7.300(1) and therefore alleges a breach not of a contractual duty, but of a "legal duty that is imposed by law."

We disagree. Plaintiff's claim for money had and received does not allege a breach of a duty imposed by EC 7.300(1). "Recovery on a theory of money had and received is based on a promise implied by law and on the equitable principle that one who has been unjustly enriched at the expense of another is required to make restitution." *C.A.M. Concepts, Inc. v. Gwyn,* 206 Or App 122, 128, 136 P3d 60 (2006). Inequitable retention of money, not wrongfulness in its acquiring, determines a payee's liability in an action for money had and received. *Smith v. Rubel,* 140 Or 422, 428-29, 13 P2d 1078 (1932). Thus, plaintiff's claim is based on the city's alleged breach of the quasi-contractual duty to pay money, not on the breach of any duty imposed by the city code. Because the duty arises under quasi-contract, plaintiff's claim, by definition, does not allege a tort within the meaning of ORS 30.260(8). Consequently, plaintiff was not required to give notice of the claim under ORS 30.275.

Because ORS 30.275 does not apply to plaintiff's claims, the city's jurisdictional argument fails. We turn to the parties' arguments on the merits.

■ ■ We begin with plaintiff's argument that the trial court erred in granting the city's motion for summary judgment and in denying plaintiff's motion. The facts pertinent to our conclusion are not in dispute. Because there are no genuine issues of material fact, we consider both motions together and determine which party is entitled to prevail as a matter of law. *See* ORCP 47 C.

As noted above, EC 7.300(1) requires the city manager to set permit fees "pursuant to [EC] 2.020 * * * in an amount sufficient to fully recover all of the City's costs

related to processing the application for the permit and inspecting the work during and after completion of the work." EC 2.020(2) provides:

"In determining the amount of any [fee imposed by the city for services, goods, use of municipal property, licenses, and permits,] the city manager shall consider:

"(a) Applicable policies, enactments and directives of the council;

"(b) The amount charged by the city in the past;

"(c) The full costs of providing the service supported by the fee;

"(d) The amounts charged by other comparable providers; and,

"(e) The revenue needs of the city as determined by the adopted city budget."

Thus, when setting a permit fee, the city manager must consider the five factors in EC 2.020(2) and set the fee in an amount sufficient to recover the city's costs associated with the permit program.

We first consider plaintiff's argument that, in both the 2002 and the 2003 orders, the city manager failed to consider the factors set forth in paragraphs (c) and (d). Because it is dispositive, we begin and end our analysis with paragraph (d), which requires the city manager to consider the amounts charged by comparable providers—here, other jurisdictions that require permits for, and inspection of, utility installation work. Plaintiff argues that the undisputed evidence shows that the city manager did not conduct any comparison of the fees proposed in the two orders to the fees charged for similar utility permits in other jurisdictions. Plaintiff points to Joyner's deposition testimony, in which he stated that the city had not obtained any information about other jurisdictions' fee schedules because he concluded that it was not relevant to determining the amount necessary to recover the permitting program's costs.

In response, the city does not dispute plaintiff's view of the evidence. Rather, it argues that plaintiff misapprehends the requirement that the city manager "consider" the

fees charged by other jurisdictions. The city asserts that Joyner's assessment of the relevance of the fees charged by other jurisdictions satisfied that requirement. It argues that EC 2.020(2)(d) does not require the city to *compare* permit fees charged by other jurisdictions. According to the city, determining that a comparison of fees would be irrelevant constitutes proper consideration of such fees. In the city's view, collecting data on what other jurisdictions charge and comparing that data to the city's proposed fees would be a meaningless procedural step.

The parties' arguments require us to construe EC 2.020(2)(d). To do that, we first examine the text and context of the code provision. *See Harris v. Sanders*, 142 Or App 126, 130, 919 P2d 512, *rev den*, 324 Or 322 (1996) (local ordinances are construed by applying interpretive method prescribed in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993)). The text itself provides the best evidence of the intent underlying the enactment of the provision. *PGE*, 317 Or at 610.

We do not share the city's view of what it is that EC 2.020(2)(d) requires the city manager to consider. The text of that provision unambiguously requires the city manager to consider "[t]he *amounts* charged by other comparable providers," not merely the fact that fees are charged. (Emphasis added.) The effect of the express requirement that the city manager consider the *amounts* charged by comparable providers is that the city manager must compare proposed fees with the fees charged by other jurisdictions: Consideration of the relevance of fees is simply not the same as consideration of the amounts themselves. Thus, contrary to the city's argument, determining that a comparison of fees would be irrelevant does not satisfy EC 2.020(2)(d). We are aware of nothing in the context that calls that conclusion into question.

We disagree with the city's contention that such a comparison is a meaningless procedural step. It could be that the city requires the city manager to consider the fees charged by other providers as a means of identifying potential problems in the city's fees. If the city manager discovered that other jurisdictions were charging significantly less for the same services, the discrepancy could mean, for example,

that the city manager had calculated the fees erroneously or that the city's inspection procedures are inefficient. At any rate, it is not our function to evaluate the city's reasons for imposing procedural requirements on the city manager. Even if a comparison of permit fees is a meaningless step, it is a step that the Eugene Code mandates. *See Young v. State of Oregon*, 161 Or App 32, 38, 983 P2d 1044, *rev den*, 329 Or 447 (1999) ("[T]he legislative power includes the authority to write a seemingly absurd law, so long as the intent to do that is stated clearly."). We are not in a position to amend the code. *Cf. Folkers v. Lincoln County School Dist.*, 205 Or App 619, 627, 135 P3d 373 (2006) ("Where * * * the legislature's intent is clear from the statutory text and context, we cannot subvert the plain meaning of the statute to avoid 'absurd results.' "). The city's argument would be better addressed to the city council.

The city concedes that the city manager did not obtain any information about the amounts charged for utility construction permits in other jurisdictions. Thus, the city manager could not have considered the amounts charged in other jurisdictions. It follows that the 2002 and 2003 orders were not validly enacted. The trial court erred in granting the city's motion for summary judgment and in denying plaintiff's motion on the declaratory judgment claim.

In light of that conclusion, we must address whether the trial court erred in determining on summary judgment that plaintiff paid the permit fees under duress. The city challenges the trial court's conclusion that the circumstances under which plaintiff paid the permit fees "amount[ed] to duress and that the plaintiff would have been entitled to recover monies paid had it otherwise prevailed." In the city's view, plaintiff paid the permit fees voluntarily and, therefore, cannot recover them even if they were invalid. Plaintiff responds that it paid the permit fees under duress because, had it not paid the fees, it would not have been able to proceed with and complete the upgrade project by the June 30, 2003, deadline and, as a consequence, would have been subject to financial penalties and termination of its franchise.

Generally, when a fee or tax has been paid with knowledge of its illegality, the payment is deemed to be voluntary and prevents a recovery of the money paid, even if the

payment was made under protest. *Johnson v. Crook County*, 53 Or 329, 333-34, 100 P 294 (1909). However, if the payment was made under duress, it is not deemed voluntary and, thus, recovery may be had. *Id.* at 334. One form of duress is economic duress, which has three elements: (1) wrongful acts or threats; (2) financial distress if the threatened party does not comply with the wrongdoer's demand; and (3) the absence of any reasonable alternative to the terms presented by the wrongdoer. *Oregon Bank v. Nautilus Crane & Equip. Corp.*, 68 Or App 131, 142-43, 683 P2d 95 (1984). Whether particular facts amount to duress is a question of law, but the underlying facts, including whether the party claiming duress acted as a reasonably prudent person in choosing the alternative that was chosen, are for the jury to decide. *Capps v. Georgia Pacific*, 253 Or 248, 257, 453 P2d 935 (1969); *Oregon Bank*, 68 Or App at 142.

The parties agree that plaintiff paid the permit fees in order to avoid the penalties, including the possible termination of its franchise, if plaintiff missed the deadline for completing the upgrade project, and there is no dispute that the penalties would have caused plaintiff financial distress. Thus, the second element of duress is satisfied. The first and third elements are at issue, however. We turn to the first element.

The city argues that the threat to impose sanctions for failure to timely complete the upgrade was not wrongful. The city correctly asserts that a threat to take action that is within the person's legal rights to take does not constitute duress. *See id.* at 143 (so holding). According to the city, it had a legal right to impose the penalties that plaintiff sought to avoid. In other words, in the city's view, there was no duress because there were no wrongful acts or threats.

We disagree. Although the city did have a legal right to impose penalties under the parties' franchise agreement, a threatened use of power for an illegitimate end is improper. *Restatement (Second) of Contracts* §§ 175(1), 176(2)(c) (1981). Inducing a party to pay an invalid fee is an illegitimate end, *cf. American Brewery Co. v. St. Louis*, 187 Mo 367, 86 SW 129 (1905) (cited with approval in *Johnson*, 53 Or at 335) (a threat by the City of St. Louis to shut off the plaintiff's water,

on which the plaintiff depended for its business, unless the plaintiff paid an invalid fee for a water license was improper), if the threat is immediate. *See Johnson*, 53 Or at 335-36 (an illegal tax may be recovered if paid under a threat to seize property that induces the belief "that the menace would be instantly executed"). In light of our conclusion that the permit fees were invalidly enacted, the city's implicit threat to terminate plaintiff's franchise unless plaintiff paid the fees was wrongful if the threat was immediate.

The issue of immediacy is also relevant to the third element of financial duress, namely, whether plaintiff had any reasonable alternatives to paying the permit fees. One factor in determining whether reasonable alternatives existed is the immediacy of the threatened financial distress. *Compare, e.g.*, *Capps*, 253 Or at 250-53 (complaint alleged duress where the plaintiff, who was in urgent need of money to avoid foreclosure of his home mortgage, agreed to release claim against the defendant for $157,000 in exchange for $5,000), *with id.* at 255-56 (discussing *Joyce v. Year Investments, Inc.*, 45 Ill App 2d 310, 314, 196 NE2d 24, 26 (1964), where a plaintiff who signed a release was not under duress where he had negotiated with the defendant for 18 months before signing and thus "had had adequate opportunity to protect himself in an equity court proceeding if he had wanted to do so as an alternative to executing the release"), *and Johnson*, 53 Or at 335-36 (no duress where the sheriff threatened to sell the plaintiff's property "in due time" but there was no indication that the sheriff was "in the act of selling the land, or that he threatened immediately to do so; or that the plaintiff, believing that the menace would be instantly executed, was by the abrupt urgency insnared into meeting the payment"); *see also Darling-Singer Lbr. Co. v. Oriental Nav. Co.*, 127 Or 655, 672, 272 P 275 (1928) (duress exists where immediate action is required to avoid future distress).

The city argues that plaintiff was subject to the 2002 and 2003 orders for 17 months before it finished the upgrade. According to the city, during that time, plaintiff had adequate legal options, including a declaratory judgment action and injunctive relief. Plaintiff responds that, given that it

completed the upgrade project only 60 days before the deadline, any delay of more than 60 days in beginning the project would necessarily have resulted in untimely completion. In plaintiff's view, 60 days would not have been enough time to obtain a judicial determination of the validity of the permit fees.

The parties' disagreement over how much time plaintiff had to seek a judicial remedy leads us to conclude that there are disputed issues of fact and, consequently, that neither party is entitled to summary judgment. One such issue is whether the city required permits for aerial installation work before the 2002 order went into effect. Evidence in the record indicates that plaintiff began construction work around July 2002. If, as the city asserts, it had always required permits for aerial installation work, then it is reasonable to infer that plaintiff knew when the 2002 order was enacted that it would apply to such permits and, thus, was in a position to seek judicial invalidation of the order as early as January 2002, when the order was enacted. If, on the other hand, the city did not previously require permits for aerial installation work, as plaintiff argues, nothing in the record indicates that plaintiff had reason to know that it would need to obtain such permits until mid-June 2002, shortly before it began construction on the upgrade project.[5] Thus, whether the city previously required permits for aerial installation work could affect the amount of time that plaintiff had to pursue alternatives to paying the permit fees by as much as five months.

Another issue is whether plaintiff had reason to know that it would finish the upgrade project in advance of the deadline. If plaintiff did not know, there is no reason to think that plaintiff reasonably could have delayed beginning the work by even 60 days. *See Restatement (Second) of Contracts* § 175 comment b (1981) ("The standard [for determining whether reasonable alternatives existed] is a practical one under which account must be taken of the exigencies in

---

[5] The record does not indicate precisely when plaintiff purportedly learned that permits would be required for aerial installations. The only evidence is a letter dated June 24, 2002, from plaintiff's attorney to the city asserting that permits had not previously been required.

which the victim finds himself * * *."). On the other hand, if plaintiff knew that it would likely finish the project early, then that time should be considered in determining whether plaintiff had reasonable alternatives.

In short, if the facts are resolved in plaintiff's favor, a factfinder could determine that it was reasonable for plaintiff to believe that any delay in beginning construction would result in missing the deadline for completion, thereby exposing plaintiff to penalties including termination of its franchise. However, if the facts are resolved in the city's favor, plaintiff may have had seven months or more in which to pursue alternatives to paying the increased permit fees. If so, the factfinder could determine that it was not reasonable for plaintiff to perceive paying the fees as its only option.

To summarize, on the question of the validity of the 2002 and 2003 orders, plaintiff was entitled to summary judgment. On remand, the trial court shall enter summary judgment for plaintiff on the declaratory judgment claim. However, questions of fact remain with respect to whether plaintiff paid the permit fees voluntarily or under duress. It follows that neither party is entitled to summary judgment on that issue and that we must remand for further proceedings on plaintiff's claim for money had and received.

Reversed and remanded.