**KEAHOLE POINT FISH LLC, Plaintiff,**

v.

**SKRETTING CANADA INC. aka Skretting North America; Does 1–10, Defendants.**

**Skretting Canada, Inc. aka Skretting North America, Counterclaimant,**

v.

**Keahole Point Fish LLC; DOES 1–10, Counter–Defendants.**

Civil No. 11–00675 KSC.

United States District Court, D. Hawai'i.

Sept. 4, 2013.

---

1018

Brandon M. Segal, Claire Wong Black, David A. Nakashima, Alston Hunt Floyd & Ing, Honolulu, HI, for Plaintiff/Counter–Defendants.

D. Matthew Doden, Jeffrey C. Johnson, Joanne M. Hepburn, K & L Gates LLP, Seattle, WA, Patricia M. Napier, Randall C. Whattoff, Goodsill Anderson Quinn & Stifel LLLP, Honolulu, HI, for Defendants/Counterclaimant,

*ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; ORDER DENYING AS MOOT 1) DEFENDANT'S SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT ON THE DOCTRINE OF RES IPSA LOQUITUR AND ANY SIMILAR THEORIES AND 2) PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT RE: CIRCUMSTANTIAL EVIDENCE UNDER STRICT PRODUCTS LIABILITY ("QUASI"-RES IPSA)*

KEVIN S.C. CHANG, United States Magistrate Judge.

Before the Court are 1) Defendant Skretting Canada Inc. aka Skretting North America's ("Defendant") Motion for Summary Judgment, filed May 17, 2013; 2) Defendant's Supplemental Motion for Summary Judgment on the Doctrine of Res Ipsa Loquitur and Any Similar Theories, filed July 8, 2013; and 3) Plaintiff Keahole Point Fish LLC's ("Plaintiff") Motion for Partial Summary Judgment Re: Circumstantial Evidence Under Strict Products Liability ("Quasi"—*Res Ipsa*), filed July 8, 2013.

These matters came on for hearing on August 29, 2013. David Nakashima, Esq., appeared on behalf of Plaintiff. Jeffrey Johnson, Esq., Patricia Napier, Esq., and Randall Whattoff, Esq., appeared on behalf of Defendant. After careful consideration of the motions, the supporting and opposing memoranda, the arguments of counsel, and the applicable law, the Court HEREBY GRANTS IN PART AND DENIES IN PART Defendant's Motion, and DENIES AS MOOT Defendant's Supplemental Motion and Plaintiff's Motion for the reasons set forth below.

## BACKGROUND

### I. *Factual History*

This action arises out of allegations that the Kona Pacific poultry meal feed that Plaintiff purchased from Defendant was defective because of nutrient deficiencies, namely taurine, and inferior ingredients.

### A. *Kona Blue*

In late 2005 or early 2006, Kona Blue, Plaintiff's predecessor, requested that Defendant prepare a custom diet for its *Seriola rivoliana.* Def.'s CSF, Decl. of Jeffrey

C. Johnson ("Johnson Decl."), Ex. A.[1] At Kona Blue's request, Defendant provided Kona Blue with four feed options with reductions in fishmeal in December 2007, including one option that substituted poultry meal for some fishmeal. *Id.* Kona Blue selected the poultry meal diet, resulting in a possible annual savings of $150,000 in feed costs. Def.'s CSF, Decl. of Christopher Beattie ("Beattie Decl.") at ¶ 5 and Ex. A.[2]

In December 2007, Defendant began shipping the Kona Pacific poultry meal feed to Kona Blue. *Id.*, Johnson Decl., Ex. D. Since 2007, all product sheets for the Kona Pacific diet contained the following disclaimer: "Individual results from the use of Skretting feed products may vary due to management, environment, genetic, health and sanitation differences. Therefore, Skretting does not warrant or guarantee individual results and reserves the right to modify it without prior notice." *Id.*, Beattie Decl. at ¶¶ 11–12, Exs. E & F. Kona Blue began feeding the Kona Pacific poultry meal feed to its *Seriola rivoliana* in early 2008. *Id.*, Johnson Decl., Ex. D. According to Neil Sims, Kona Blue's president, Chris Beattie, Defendant's general manager, advised him that Kona Pacific feed would provide a balanced diet. *Id.*, Johnson Decl., Ex. E; Pl.'s CSF, Additional Material Facts ("AMF") at ¶ 3 & Ex. 3.[3] The Kona Pacific feed formula was based on the nutritional and dietary requirements of salmon. Pl.'s CSF, AMF at ¶¶ 6–8.

In July 2008, Kona Blue reported to Defendant that it experienced some of the best fish survival in company history. Pl.'s CSF, Ex. 20. In October 2008, Kona Blue complained of slower growth and reduced feed response. *Id.*, AMF at ¶¶ 6–9. Eventually, Kona Blue determined that overstocking, strep infection, and skin flukes caused the issues, and mortality rates in 2008 were in fact low. Def.'s CSF, Johnson Decl., Ex. D; Def.'s Reply CSF at ¶¶ 6–8. Defendant represents that Kona Blue thereafter reported successful results for nearly two years while its fish were consuming the Kona Pacific poultry meal feed. Def.'s CSF, Beattie Decl. at ¶ 6. At the end of 2009, Kona Blue was successfully harvesting *Seriola rivoliana* at average weights over four-and-a-half pounds, which was at or exceeding the farm's historical harvest weights. *Id.*, Johnson Decl., Exs. A & D.

B. *Acquisition by Plaintiff of Kona Blue*

In February 2010, Plaintiff assumed control of the aquafarm. *Id.*, Beattie Decl., Ex. D. Prior to its acquisition of the farm, Plaintiff conducted due diligence with respect to Kona Blue's practices, harvest data, and financial data. *Id.*, Johnson Decl., Exs. E & F. Kona Blue disclosed that it requested that Defendant replace some fishmeal with poultry meal, and recommended another feed company to enable Plaintiff to consider other feeds. *Id.*, Johnson Decl., Ex. E.

Plaintiff claims that after it began operations, Defendant further reduced the amount of fishmeal in the feed and replaced it with alternative protein materials that contained less taurine by weight.

---

1. Exhibits A, C, E, F, H, J, M, O, and P to the Johnson Declaration are filed under seal. Exhibits A, C, and D attached to Defendant's Reply CSF are filed under seal. The Court will limit the facts to those provided in the parties' public filings, even if citing to sealed exhibits.

2. Exhibit H to the Beattie Declaration is filed under seal.

3. Exhibits 2, 3, 6, 8, 10, 13, 16, and 18 to Plaintiff's CSF are filed under seal.

Pl.'s CSF, AMF at ¶ 9, Ex. 11. Defendant disputes this allegation, and maintains that not only did the formula not change when Plaintiff purchased the farm, but that there was no change to the formula from late 2007 until July 2011, when Plaintiff requested that the formulation return to the original Kona Pacific diet that did not include poultry meal. Def.'s CSF, Johnson Decl., Ex. C; Beattie Decl., Ex. H. Plaintiff represents that the purported fishmeal reduction resulted in poor eating and slowed growth. Pl.'s CSF, AMF at ¶ 10, Ex. 4. In addition, Plaintiff noticed increased susceptibility to bacterial infections, poor reaction to routine treatments, and abnormally high daily mortalities. Id. When Plaintiff queried Defendant about whether it had changed the formulation of the feed, Mr. Beattie responded that while the ingredients may vary over time, the formulation had not changed at all for a couple of years. Pl.'s CSF, AMF at ¶ 11, Ex. 2; Def.'s Reply CSF at ¶ 11; Def.'s CSF, Johnson Decl., Ex. B.

### C. The Parties' Agreement Regarding the Purchase of Kona Pacific Feed

On January 13, 2010, Todd Madsen, Plaintiff's president, signed Defendant's Customer Record/Credit Application. The Application stated: "We hereby jointly and severally agree to pay your account ... according to your terms of sale and to pay interest at the rate set by [Defendant] on all amounts in arrears as outlined in the terms and conditions of sale." Def.'s CSF, Beattie Decl., Ex. B. Invoices accompanying each order contained the terms and conditions of the sale of the feed, including payment terms, items purchased, quantity, and price. Id., Beattie Decl., Ex. C. Defendant also provided Plaintiff with prod-

uct sheets containing its disclaimer that individual results may vary and that it does not warrant or guarantee individual results.[4] Id., Johnson Decl., Ex. A; Beattie Decl., Ex. F.

### D. Plaintiff's Switch to High Fishmeal Feed

In early 2011, Plaintiff hypothesized that taurine deficiency was the cause of problems with its fish. Id., Johnson Decl., Ex. B. In an email dated May 18, 2011, Mr. Madsen inquired with Mr. Beattie about ingredient information and indicated that Plaintiff was investigating whether feed formulation changes were contributing to growth issues. Id., Beattie Decl., Ex. G. On June 7, 2011, Gavin Shaw provided estimated taurine levels in the feed and calculated a weighted average of taurine for all feed sizes of approximately 0.17%. Id., Johnson Decl., Ex. B. Just one day prior, however, Plaintiff stopped purchasing the Kona Pacific poultry meal feed and ordered the high fishmeal feed. Id., Beattie Decl., Ex. I.

In August 2011, Plaintiff began purchasing a high fishmeal feed from EWOS, Defendant's competitor. By Plaintiff's accounts, following the switch to the EWOS feed, the health of the fish improved quickly and dramatically, mortalities dropped, and Plaintiff has since successfully raised four more Cohorts. Pl.'s CSF, Ex. 4. The EWOS feed had a higher taurine content than the Kona Pacific poultry meal feed.

## II. Procedural History

Plaintiff commenced this action on November 3, 2011. On December 22, 2011, Plaintiff filed a First Amended Complaint, asserting the following claims: 1) negligence (Count 1); 2) intentional misrepre-

---

**4.** Plaintiff disputes that the language on the product sheets are disclaimers as a matter of law. The Court uses the term disclaimer descriptively, and shall discuss the legal sufficiency of the disclaimer below.

sentation (Count 2); 3) negligent misrepresentation (Count 3); 4) products liability (Count 4); 5) implied warranty of merchantability (Count 5); 6) implied warranty of fitness (Count 6); and 7) unjust enrichment (Count 7).

Defendant filed a Counter–Complaint on December 29, 2011, alleging that Plaintiff breached its contract with Defendant by ordering and taking possession of Kona Pacific high fishmeal feed, but failing to pay $36,548.60.

### STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a). "A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." *Soremekun v. Thrifty Payless, Inc.,* 509 F.3d 978, 984 (9th Cir.2007) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir. 1987). In a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party. *State Farm Fire & Cas. Co. v. Martin,* 872 F.2d 319, 320 (9th Cir.1989).

Once the moving party has met its burden of demonstrating the absence of any genuine issue of material fact, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *T.W. Elec.,* 809 F.2d at 630; Fed. R.Civ.P. 56(c). The opposing party may not defeat a motion for summary judgment in the absence of any significant probative evidence tending to support its legal theory. *Intel Corp. v. Hartford Accident &*

*Indem. Co.,* 952 F.2d 1551, 1558 (9th Cir. 1991). The nonmoving party cannot stand on its pleadings, nor can it simply assert that it will be able to discredit the movant's evidence at trial. *T.W. Elec.,* 809 F.2d at 630; *Blue Ocean Preservation Soc'y v. Watkins,* 754 F.Supp. 1450, 1455 (D.Haw.1991).

If the nonmoving party fails to assert specific facts, beyond the mere allegations or denials in its response, summary judgment, if appropriate, shall be entered. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 884, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); Fed. R. Civ. P 56(e). There is no genuine issue of fact if the opposing party fails to offer evidence sufficient to establish the existence of an element essential to that party's case. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; *Citadel Holding Corp. v. Roven,* 26 F.3d 960, 964 (9th Cir.1994); *Blue Ocean,* 754 F.Supp. at 1455.

In considering a motion for summary judgment, "the court's ultimate inquiry is to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." *T.W. Elec.,* 809 F.2d at 631 (citing *Anderson v. Liberty Lobby,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Inferences must be drawn in favor of the nonmoving party. *Id.* However, when the opposing party offers no direct evidence of a material fact, inferences may be drawn only if they are reasonable in light of the other undisputed background or contextual facts and if they are permissible under the governing substantive law. *Id.* at 631–32. If the factual context makes the opposing party's claim implausible, that party must come forward with more persuasive evidence than otherwise necessary to show there is a genuine issue for trial. *Bator v. State of Hawaii,*

39 F.3d 1021, 1026 (9th Cir.1994) (citing *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics*, 818 F.2d 1466, 1468 (9th Cir.1987), *cert. denied*, 484 U.S. 1006, 108 S.Ct. 698, 699, 98 L.Ed.2d 650 (1988)).

## DISCUSSION

Defendant moves for summary judgment on all claims, including its counterclaim. The Court addresses each argument in turn.

### I. *Preemption*

Defendant argues that it is entitled to summary judgment on Plaintiff's negligence, products liability, implied warranty of merchantability, and implied warranty of fitness claims because they are preempted by the Federal Food, Drug, and Cosmetic Act ("FDCA"). Specifically, Defendant maintains that it could not have consistently satisfied Plaintiff's desired taurine levels without supplementing its fish feed with crystalline taurine, a food additive, in violation of 21 C.F.R. § 573.980.

■ Under the Supremacy Clause, the laws of the United States "shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., Art. VI, cl. 2. Accordingly, "state laws that conflict with federal law are 'without effect.'" *Mut. Pharm. Co. v. Bartlett,* —— U.S. ——, 133 S.Ct. 2466, 2473, 186 L.Ed.2d 607 (2013) (citations omitted). "Federal preemption occurs when: (1) Congress enacts a statute that explicitly pre-empts state law; (2) state law actually conflicts with federal law; or (3) federal law occupies a legislative field to such an extent that it is reasonable to conclude that Congress left no room for state regulation in that field." *Chae v. SLM Corp.*, 593 F.3d 936, 941 (9th Cir. 2010) (citations omitted).

■ The FDCA does not contain a preemption clause. *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 339, 128 S.Ct. 999, 169 L.Ed.2d 892 (2008). Even when there is an absence of an express preemption provision, however, state law may be impliedly preempted when "it is 'impossible for a private party to comply with both state and federal requirements.'" *Id.* (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990)); *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963) (An inquiry into congressional design is not required "where compliance of both federal and state regulations is a physical impossibility for one engaged in interstate commerce.").

Conflict preemption, which Defendant argues applies here, implies Congress's intent to preempt state law to the extent there is conflict between federal and state law. *Whistler Invs., Inc. v. Depository Trust and Clearing Corp.*, 539 F.3d 1159, 1164 (9th Cir.2008). It arises when it is impossible for a party to comply with both federal and state law "or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Hunter v. Philip Morris USA*, 582 F.3d 1039, 1046 (9th Cir.2009) (citations omitted). Showing preemption by impossibility is a "demanding defense." *Wyeth v. Levine*, 555 U.S. 555, 573, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009).

The FDCA presumes that food additives are unsafe until the Food and Drug Administration ("FDA") formally authorizes their use. 21 U.S.C. §§ 342, 348. The FDCA defines "food additive" as

any substance the intended use of which results or may reasonably be expected to result, directly or indirectly, in its becoming a component or otherwise af-

fecting the characteristics of any food ... if such substance is not generally recognized, among experts qualified by scientific training and experience to evaluate its safety, as having been adequately shown through scientific procedures ... to be safe under the conditions of its intended use.

21 U.S.C. § 321(s). The FDA has deemed taurine safe for use in animal feeds provided that "[i]t is added to complete feeds so that the total taurine content does not exceed 0.054 percent of the feed." 21 C.F.R. § 573.980(b).

Defendant asserts that given these restrictions on taurine, successfully and consistently meeting Plaintiff's taurine requirements would require illegal supplementation of the feed with crystalline taurine, a food additive, which would result in a conflict between federal and state law. Plaintiff claims that Defendant, as well as EWOS, sold and manufactured feed that met Plaintiff's minimum taurine level solely through the use of fishmeal. It is Plaintiff's position that because naturally occurring taurine is not a food additive, it does not implicate food additive regulations.

The issue before the Court is whether federal law preempts Plaintiff's state law claims alleging that 1) Defendant's failure to produce and provide a fish feed that contained sufficient taurine caused it to breach its duty of care to Plaintiff; 2) the feed was defective in design and manufacture because it failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably forseeable manner; and 3) Defendant breached the implied warranties of fitness for purpose and merchantability by designing and manufacturing a defective feed that was not fit for consumption.

In evaluating preemption, the Court is guided by two cornerstones of ... preemption jurisprudence. First, "the purpose of Congress is the ultimate touchstone in every pre-emption case." *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (internal quotation marks omitted); *see Retail Clerks v. Schermerhorn,* 375 U.S. 96, 103, 84 S.Ct. 219, 11 L.Ed.2d 179 (1963). Second, "[i]n all pre-emption cases, and particularly in those in which Congress has 'legislated ... in a field which the States have traditionally occupied,' ... [the court] 'start[s] with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Lohr,* 518 U.S. at 485, 116 S.Ct. 2240 (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)).

*Wyeth,* 555 U.S. at 565, 129 S.Ct. 1187 (alterations in original). "[O]ne of the [FDCA's] core objectives is to ensure that any product regulated by the FDA is 'safe' and 'effective' for its intended use." *Food and Drug Admin. v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000). The mission of the FDA is to "protect the public health by ensuring that ... foods are safe, wholesome, sanitary, and properly labeled." 21 U.S.C. § 393(b)(2).

For preemption to apply in the present case, the facts would have to undisputably demonstrate that Defendant could not manufacture a feed satisfying Plaintiff's minimum taurine requirement without taurine supplementation. As earlier discussed, taurine is a food additive that can only be added to animal feed under the limited circumstances set forth in 21 C.F.R. § 573.980. Thus, any supplementation of Defendant's feed with taurine would violate the FDCA and 21 C.F.R. § 573.980, and any liability resulting from Plaintiff's

state law claims would conflict with federal law.

■ Based on the record before the Court, genuine issues of material fact exist that preclude summary judgment. Central to Plaintiff's negligence, products liability, implied warranty of merchantability, and implied warranty of fitness claims is Plaintiff's belief that a feed must contain a specific range of taurine to be optimal for *Seriola rivoliana.* The parties dispute Defendant's ability to manufacture a feed meeting Defendant's minimum requirement without supplementation.

Plaintiff cites test results of feed manufactured by both Defendant and EWOS to support its assertion that its minimum taurine requirement was met, and could be met, through naturally occurring taurine in fishmeal and other raw materials. Defendant challenges that the test results demonstrate that it was impossible to meet Plaintiff's taurine requirement and comply with federal law. The Court agrees that the evidence tends to suggest that it would be difficult to consistently produce a feed with sufficient taurine. However, because Defendant and EWOS have successfully done so, even if unreliably so, it is *possible.* Viewing the evidence in the light most favorable to Plaintiff, there is a material factual dispute about whether Defendant could have manufactured a feed that included sufficient taurine without resorting to supplementation.[5]

Consequently, the granting of summary judgment with respect to Plaintiff's negligence, products liability, and implied warranty claims on grounds of preemption would be improper.[6]

## II. *Economic Loss Rule*

Defendant also seeks a ruling that Plaintiff's negligence, intentional/negligent misrepresentation, and products liability claims are barred by the economic loss rule because Plaintiff's damages reflect purely economic losses. Plaintiff asserts that the rule is inapplicable because the defective feed damaged its "other property."

■ The economic loss rule bars causes of action "where a plaintiff alleges a purely economic loss stemming from injury only to the product itself."[7] *State of Ha-*

---

5. Plaintiff additionally asserts that Defendant could have obtained a "generally recognized as safe" ("GRAS") determination, which would have permitted use of taurine supplementation. In response, Defendant emphasizes that it had no obligation to obtain a GRAS determination, and that a GRAS determination does not create a legally binding exception to the FDA regulation of food additives. Plaintiff has not cited any legal authority requiring a defendant to take all possible steps before preemption could apply. Plaintiff has obtained a GRAS determination for taurine supplementation in fish feed. However, a GRAS determination obtained after the relevant time period has no bearing on the applicability of preemption. The Court's inquiry focuses on whether Plaintiff's state law claims would impose a duty or liability on Defendant that conflicts with the FDCA. Absent a GRAS determination during the relevant time period, if the only way Defendant could consistently provide feed containing Plaintiff's minimum taurine requirements was to supplement with taurine, in violation of the FDCA and 21 C.F.R. § 573.980, Plaintiff's state law claims would be preempted.

6. Defendant argues that the foregoing claims are impliedly preempted because they stand as an obstacle to accomplishing federal objectives. For the reasons stated above, this could only be so if there was no dispute that taurine supplementation was required to produce a feed with adequate taurine levels.

7. This rule is codified at Hawaii Revised Statutes ("HRS") § 663–1.2, *BlueEarth Biofuels, LLC v. Hawaiian Elec. Co.,* 780 F.Supp.2d 1061, 1082 (D.Haw.2011), which provides that "[n]o person may recover damages, including punitive damages, in tort for a breach of a contract in the absence of conduct that:

*waii ex rel. Bronster v. U.S. Steel Corp.,* 82 Hawai'i 32, 39, 919 P.2d 294, 301 (1996); *City Express, Inc. v. Express Partners,* 87 Hawai'i 466, 469, 959 P.2d 836, 839 (1998). It

> marks the fundamental boundary between the law of contracts, which is designed to enforce expectations created by agreement, and the law of torts, which is designed to protect citizens and their property by imposing a duty of reasonable care on others. The economic loss rule was designed to prevent disproportionate liability and allow parties to allocate risk by contract.

*City Express,* 87 Hawai'i at 469, 959 P.2d at 839 (quoting *Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist.,* 124 Wash.2d 816, 881 P.2d 986, 989–90 (1994) (en banc)) (quotations omitted). Damage to a product itself is most appropriately a warranty claim. *Bronster,* 82 Hawai'i at 40, 919 P.2d at 302. "Such damage means simply that the product has not met the customer's expectations, or, in other words, that the customer has received 'insufficient product value.' "[8] *Id.* (citation omitted). Under the economic loss rule, "a manufacturer in a commercial relationship has no duty under either a negligence or strict products liability theory to prevent a product from injuring itself." *Leis Family Ltd. P'ship v. Silversword Eng'rg,* 126 Hawai'i 532, 538–39, 273 P.3d 1218,

1224–25 (Haw.Ct.App.2012) (quoting *Bronster,* 82 Hawai'i at 39, 919 P.2d at 301). The rule also applies to negligent design and/or manufacture theory, *Bronster,* 82 Hawai'i at 40, 919 P.2d at 302, and negligent misrepresentation. *City Express,* 87 Hawai'i at 470, 959 P.2d at 840 (holding that "in the context of construction litigation regarding the alleged negligence of design professionals, a tort action for negligent misrepresentation alleging damages based purely on economic loss is not available to a party in privity of contract with a design professional").[9] The most recent Hawaii Supreme Court case addressing the economic loss rule in the construction context, *Ass'n of Apartment Owners of Newtown Meadows ex rel. its Board of Directors v. Venture 15,* 115 Hawai'i 232, 167 P.3d 225 (2007), held that recovery in negligence is barred, even in the absence of privity of contract, "when allowing such recovery would blur the distinction between contract and tort law." *Id.* at 292, 167 P.3d at 285; *Leis,* 126 Hawai'i at 538, 273 P.3d at 1224 ("*Newtown Meadows,* although a construction case not involving design professionals, clearly stands for the proposition that the economic loss doctrine bars the recovery of purely economic losses, even in the absence of privity of contract, so long as 'allowing such recovery would blur the distinction between contract and tort law.' "). At issue in *Newtown Meadows* was whether the plaintiff's

---

(1) Violated a duty that is independently recognized by principles of tort law; and (2) Transcended the breach of the contract." Haw.Rev.Stat. § 663–1.2.

**8.** Defendant encourages this Court to adopt other jurisdictions' "disappointed expectations" test. Plaintiff correctly asserts that the Hawaii Supreme Court has not adopted this test, and this Court declines to do so. However, Defendant's focus on a plaintiff's expectations and value received are not without basis, as they both serve as the underlying rationale behind the economic loss rule.

**9.** As noted by Defendant, the Intermediate Court of Appeals has clarified that the *City Express* court's rationale was not limited to design professionals. *Leis,* 126 Hawai'i 532, 538 n. 6, 273 P.3d 1218, 1224 n. 6. This district has also concluded that the economic loss doctrine could apply to negligent misrepresentation claims. *Burlington Ins. Co. v. United Coatings Mfg. Co., Inc.,* 518 F.Supp.2d 1241, 1254 n. 10 (D.Haw.2007).

damages [10] were "purely economic losses" and whether "other property" was damaged, i.e. cracked floor tile, demising walls, skewed door jambs and windows, damage caused by termites entering through floor cracks, as a result of the negligent construction of concrete slabs. *Newtown Meadows*, 115 Hawai'i at 293, 167 P.3d at 286.

The court concluded that the plaintiff's damages consisted of purely economic losses, and noted that the plaintiff did not seek damages for personal injuries. *Id.* at 294, 167 P.3d at 287. In reaching this conclusion, the Court relied on cases applying the economic loss rule to situations where the defective product is a component of an integrated system/structure and causes damage to other components of the system/structure because the damage is to the defective product itself, not "other property." *Id.* at 293–94, 167 P.3d at 286–87. The court further held that "even assuming *arguendo* that the cracked floor tiles, demising walls, skewed door jambs and windows, and damage caused by termites entering through the cracks were caused by the allegedly defective floor slabs, such consequential damages do not constitute damage to 'other property.' " *Id.* at 294–95, 167 P.3d at 287–88.

This district has interpreted *Newtown Meadows* to extend the reach of the economic loss rule to preclude "purely economic losses including 'consequential damages' to property other than the allegedly defective product." *Burlington,* 518 F.Supp.2d at 1254 (citation omitted).[11]

"Economic losses encompass Marriages for inadequate value, costs of repair and replacement of [the] defective product, or consequent loss of profits-without any claim of personal injury or damage to other property.' " *Newtown Meadows,* 115 Hawai'i at 293, 167 P.3d at 286 (citations and quotations omitted) (alteration in original); *City Express,* 87 Hawai'i at 469, 959 P.2d at 839 (in cases involving negligent design of building, economic loss damages are those pertaining solely to the costs related to the operation and value of the building itself, i.e. additional costs, lost rent, the cost of remedying the alleged building defects, and the difference between the value of the building as designed and the value it would have had if it had been properly designed; personal injuries caused by the defective design or damage to property other than the building itself are excluded); *Millenkamp v. Davisco*

---

**10.** The plaintiff sought the following damages: "(1) damage to the units at Newtown Meadows; (2) a continuous exposure to conditions which resulted in damage to the units; (3) loss in value of the units; (4) the costs of experts; (5) an increase in maintenance costs; (6) the cost to remedy the defects; and (7) 'other consequential damages.' " *Newtown Meadows,* 115 Hawai'i at 294, 167 P.3d at 288.

**11.** Plaintiff mischaracterizes the *Burlington* holding as dicta. In actuality, it was an alternative basis for the *Burlington* court's ruling. *Burlington,* 518 F.Supp.2d at 1252. The *Burlington* court elected to consider and discuss the economic loss doctrine, and this Court will not disregard that portion of the opinion just because it was not the primary basis for

the court's ruling. Plaintiff additionally argues that *Burlington* misconstrued *Newtown Meadows.* The Court disagrees. Although the *Burlington* court did not summarize or discuss the rationale behind the *Newtown Meadows* decision, the *Newtown Meadows* court indeed found that under the facts before it, purely economic losses, including consequential damages to property other than the allegedly defective product, were barred by the economic loss rule. As this Court summarized above, the *Newtown Meadows* court reached this conclusion by reasoning that said damages were not "other property." The Court acknowledges, however, that because application of the economic loss rule is fact specific, the *Burlington* court's interpretation may not be applicable to all cases.

*Foods Int'l, Inc.*, 391 F.Supp.2d 872, 878 (D.Idaho 2005) (" 'Economic loss' includes costs of repair and replacement of defective property which is the subject of the [litigation], as well as commercial loss of profits or use . . . Alternatively, property damage encompasses damage to property other than that which is the subject of the [litigation].") (citations omitted).

■ Plaintiff submits that its tort claims are not barred by the economic loss rule because the feed damaged its fish, i.e. "other property." An exception to the rule exists when the finished product causes damage to "other property." *Kawamata Farms, Inc. v. United Agric. Prods.*, 86 Hawai'i 214, 254, 948 P.2d 1055, 1095 (1997). *Kawamata* involved allegations by the plaintiffs that Benlate, an agricultural fungicide, damaged their plants, soil, and farm structures. *Id.* at 221, 948 P.2d at 1062. Following trial, the jury awarded compensatory and punitive damages based on the injury to the plaintiffs' crops. *Id.* at 227, 948 P.2d at 1068. The jury did not award damages for soil or farm structure restoration. *Id.* at 228, 948 P.2d at 1069.

The defendants filed a motion for judgment notwithstanding the verdict, arguing that the economic loss doctrine barred recovery in tort given the jury's conclusion that the plaintiff's injuries were a result of "economic loss" rather than damage to soil or farm structures. *Id.* In denying the motion, the circuit court concluded in pertinent part that "[t]he majority of Plaintiffs' compensatory damages awarded by the jury were for plant replacement costs for the damages to Plaintiffs' plant inventory [that] constitutes 'other property,' which therefore brings this case out of the realm of the economic loss doctrine." *Id.* (alterations in original) (quotations omit-

ted). The Hawaii Supreme Court affirmed the circuit court decision, holding that

> the Plaintiffs bargained for Benlate as the finished product, and this finished product damaged 'other property' consisting of the Plaintiffs' crops upon which Benlate was applied. Where the finished product caused damage to other property, the economic loss doctrine does not apply, and, thus, the economic loss doctrine did not bar the Plaintiffs from recovering damages for their crop damage.

*Id.* at 254, 948 P.2d at 1095.

■ At first glance, *Kawamata* appears to be directly on point. However, upon closer examination of the facts, there are critical distinctions between *Kawamata* and this case. Plaintiff submits that it may recover in tort for the physical injury to its fish caused by the defective feed. Yet it does not seek damages for physical injury to its fish. Instead, it bases its damages theory "on a lost profits methodology which considers financial losses as well as avoided costs over a damage period, or period of restoration," and it seeks damages for lost revenue, actual feed cost incurred, and additional costs incurred.[12] Def.'s CSF, Johnson Decl., Ex. M at 3. All of these types of damages constitute economic losses under Hawaii law.

By contrast, the damages awarded in *Kawamata* were for injury to the plaintiffs' plants; specifically, the replacement costs for the plants, i.e. "other property." Insofar as Plaintiff does not seek damages for injury to its fish, the Court finds that the economic loss rule bars recovery with respect to Plaintiff's negligence, products liability, and negligent misrepresentation claims. *Millenkamp*, 391 F.Supp.2d at 875–79 (in a breach of warranty and negligence case alleging that milk permeate

---

**12.** Plaintiff admits that this is its damages theory. Pl.'s CSF at 2.

caused the death of calves, the court found that because the plaintiffs sought purely economic damages and no exception to the economic loss rule applied to the facts and circumstances of the case, summary judgment was appropriate as to the plaintiffs' negligence and negligence per se claims).

This conclusion is consistent with the legal principles set forth in *Newtown Meadows* and *Burlington,* even though this case is factually distinguishable in that it is not construction litigation. Neither *Newtown Meadows* nor *Burlington*[13] limited their holdings to the construction context.[14] Accordingly, this Court's decision to apply the economic loss rule, which is founded upon Plaintiff's purely economic damages theory and the absence of damages for injury to the fish, is further supported by the foregoing cases. That is, to the extent Plaintiff's economic damages could be construed to relate to the fish or to property other than the allegedly defective feed, they would be precluded. *Burlington,* 518 F.Supp.2d at 1254; *Newtown Meadows,* 115 Hawai'i at 293–95, 167 P.3d at 286–88. The Court recognizes that the feed and fish are not part of an integrated structure or system, but as already discussed, its decision is predicated on the fact that Plaintiff does not seek damages for injury to the fish, i.e. "other property."

■ Having concluded that the economic loss rule applies, the Court must determine whether it bars Plaintiff's intentional misrepresentation claim. As earlier discussed, the Hawaii courts have held that the rule applies to negligence, products liability, and negligent misrepresentation claims. They have not, however, authorized the application of the rule to intentional misrepresentation claims. In the absence of state court precedent extending the economic loss rule to intentional misrepresentation claims, the Court declines to extend the rule here. Accordingly, the Court finds that the economic loss rule bars Plaintiff's negligence, products liability, and negligent misrepresentation claims, and grants summary judgment in Defendant's favor as to said claims.

Insofar as the economic loss doctrine bars Plaintiff's products liability claim, Plaintiff and Defendant's summary judgment motions concerning the applicability of the res ipsa loquitur doctrine are denied as moot.

### III. *Intentional Misrepresentation*

■ Defendant moves for summary judgment on the ground that it did not make any actionable misrepresentation claims. To prove a claim of intentional misrepresentation, a plaintiff must establish that "(1) false representations were made by defendants, (2) with knowledge of their falsity (or without knowledge of their truth or falsity), in contemplation of plaintiff's reliance upon these false representations, and (4) plaintiff did rely upon them." *Shoppe v. Gucci Am., Inc.,* 94 Hawai'i 368, 386, 14 P.3d 1049, 1067 (2000). "To be actionable, the alleged false representation must relate to a past or existing material fact and not the occurrence of a future event." *Id.* (citation omitted).

---

**13.** *Burlington* was an insurance declaratory action, but the underlying state court action involved a defective topcoat used in the repair and repainting of residential buildings. *Burlington,* 518 F.Supp.2d 1241.

**14.** "The legal principle enunciated in *Newtown Meadows* is of general applicability."

*Leis,* 126 Hawai'i 532, 538 n. 7, 273 P.3d 1218, 1224 n. 7. Moreover, like the plaintiff in *Newtown Meadows,* who did not seek damages for personal injuries caused by the allegedly defective concrete floor slabs, Plaintiff is not seeking damages for physical injuries to its fish caused by the allegedly defective feed.

Plaintiff's misrepresentation claims are based on four representations made by Defendant.

## A. *Feed Formulation*

The first alleged misrepresentation made by Mr. Beattie was that the Kona Pacific feed formulation did not change since early 2008. Defendant contends that this is not an actionable misrepresentation because minor changes in raw material concentrations between different feed orders do not constitute a change in the formula. Plaintiff accuses Defendant of manufacturing a distinction between the words "formula" and "raw material concentrations." Plaintiff points to Defendant's formulation data to establish that changes in raw material concentrations constitute a change in the formula. Pl.'s CSF, Ex. 11.

■■■ A close examination of the evidence reveals no disputed issues of material fact, even viewing such evidence in a light most favorable to Plaintiff. According to Defendant, it uses a "least cost formulation" to select the most cost effective ingredients in its inventory that still satisfy the nutrient requirements and raw material limitations set in the formula. Def.'s CSF, Johnson Decl., Exs. C & P. Indeed, Greg Deacon testified that that the feeds are produced using a feed formulation program, with ingredient parameters set by a formulator. Def.'s CSF, Johnson Decl., Ex. C. He further testified that when Kona Blue requested a change to the poultry meal feed in 2007, he probably lowered the feed's fishmeal content to 20%. *Id.*

Mr. Shaw similarly testified that Defendant used a program called "Format" to formulate its diets, wherein minimum and maximums for every product by size were set within Format's parameters. Def.'s CSF, Johnson Decl., Ex. P. Mr. Shaw also

stated that Format determines which raw materials are best for use on a particular day. *Id.* The formulation data cited by Plaintiff establishes that ingredient percentages changed over time, which is consistent with the undisputed facts, including Mr. Madsen's testimony that Mr. Beattie explained that ingredients may vary over time. Pl.'s CSF, AMF at ¶ 11, Ex. 2; Def.'s Reply CSF at ¶ 11; Def.'s CSF, Johnson Decl., Ex. B. Therefore, the evidence establishes that Mr. Beattie accurately represented that the formula did not change because any variation in the ingredient content still fell within the formula's parameters/restrictions. For example, notwithstanding the fact that the ingredient percentages changed over time, as reflected in the formulation data, the fishmeal numbers referenced by Plaintiff demonstrate that the fishmeal level always exceeded the 20% formulation level set by Mr. Deacon for the Kona Pacific poultry meal feed.

Based on the foregoing, the Court hereby finds, as a matter of law, that Mr. Beattie's statement about a lack of change to the formula since 2008 was not a false representation.

## B. *Successful Growth*

■■■ The second alleged misrepresentation is Mr. Beattie's statement that Kona Blue had successfully grown *Seriola rivoliana* on the Kona Pacific poultry meal feed, despite his knowledge that Kona Blue had experienced similar feeding and growth problems after switching to said feed. Kona Blue reported to Defendant in July 2008 that it experienced some of the best fish survival in company history. Pl.'s CSF, Ex. 20. Citing communications between Kona Blue and Mr. Beattie several months later, which expressed Kona Blue's concern about feeding and growth issues,

Plaintiff asserts that a genuine issue of material fact exists. The Court disagrees.

The issues with growth and feeding around October 2008 were later determined to be caused by overstocking, skin flukes, and strep infection. Def.'s Reply CSF, Supplemental Johnson Decl., Ex. B. In addition, Kona Blue reported successful results for nearly two years while its fish were consuming the feed. Def.'s CSF, Beattie Decl. at ¶ 6. Thus, Plaintiff has not come forward with significant probative evidence tending to support its legal theory that Mr. Beattie misrepresented Kona Blue's success with the Kona Pacific poultry meal feed.

It is worth noting too, that Plaintiff had access to Kona Blue's records prior to its acquisition of the aquafarm, so Plaintiff had at its disposal information to confirm Kona Blue's success, or lack thereof, using the Kona Pacific poultry meal feed. By the time Plaintiff assumed control of the aquafarm in February 2010, the fish had been consuming the Kona Pacific poultry meal feed for approximately two years. For these reasons, the Court grants Defendant's Motion as to representations about the growth of the fish on Kona Pacific feed.

### C. *Taurine Concentration in Feed*

■ The third alleged misrepresentation concerned the taurine concentration level in the Kona Pacific poultry meal feed, which Plaintiff alleges Mr. Shaw falsely represented. Mr. Shaw provided estimated levels of taurine and calculated a weighted average of taurine for all feed sizes around 0.17% on June 7, 2011, a fact undisputed by Plaintiff. However, just one day prior, Defendant stopped purchasing the Kona Pacific poultry meal feed and ordered the Kona Pacific high fishmeal feed. Defendant asserts that in view of these facts, Plaintiff cannot establish that

it relied on Mr. Shaw's representations about the taurine content. The Court agrees.

Plaintiff cannot reasonably contend that it relied on a statement/representation about taurine content in the Kona Pacific poultry meal feed when it had already stopped purchasing the feed and decided to purchase the high fishmeal feed. Plaintiff failed to respond to Defendant's arguments about this alleged misrepresentation so the Court assumes that Plaintiff has waived any arguments concerning said representation. There being no opposition by Plaintiff, and the Court finding that no genuine issues of material fact exist, Defendant is entitled to summary judgment.

### D. *Appropriateness and Fitness of Feed*

Lastly, Plaintiff claims that in July 2010, Mr. Beattie misrepresented that the Kona Pacific feed formulation was appropriate and fit for use with *Seriola rivoliana*. Defendant submits that this statement is not actionable because a misrepresentation claim cannot be based on mere broken promises or unfulfilled predictions or expectations. Defendant also characterizes Mr. Beattie's statement as sales talk or "puffing."

■ Plaintiff does not challenge Defendant's argument that a representation cannot consist of broken promises of unfulfilled predictions or expectations, countering only that Mr. Beattie's statement was not "puffing," but an actionable statement that was sufficient to deceive. Hawaii law is clear that a misrepresentation claim

*cannot be predicated on statements which are promissory in their nature or constitute expressions of intention, and an actionable representation cannot consist of mere broken promises, or er-*

*roneous conjectures as to future events, even if there is no excuse for failure to keep the promise, and even though a party acted in reliance on such promise.* *Id.* (quoting *Stahl v. Balsara*, 60 Haw. 144, 149, 587 P.2d 1210, 1214 (1978)). As discussed with respect to the second alleged misrepresentation (subsection B), Mr. Beattie believed that the fish had successfully grown on the Kona Pacific feed. Thus, even accepting Plaintiff's factual allegations as true, Plaintiff has not set forth significant probative evidence that Mr. Beattie made a false statement, and certainly not that he knew of the falsity of the statement, assuming it was false. Furthermore, the promissory nature of the representation makes its non-actionable. Accordingly, the Court grants summary judgment on Plaintiff's intentional misrepresentation claim.

IV. *Implied Warranty of Merchantability*

Defendant argues that it is entitled to summary judgment on Plaintiff's breach of implied warranty of merchantability claim because no warranty attached to the custom designed Kona Pacific meal feed, which was for an unknown species and thus had no ordinary purpose. Plaintiff counters that a warranty attaches to all products, even those that are custom made. Plaintiff submits that the issue of whether the feed was defective or unfit for the ordinary purposes for which it was used is disputed.

 The implied warranty of merchantability is arguably the broadest warranty in the Uniform Commercial Code, and is "implied by operation of law into every sale of goods by a merchant seller." *Ontai v. Straub Clinic and Hosp. Inc.*, 66 Haw. 237, 249–50, 659 P.2d 734, 744 (1983) (citations omitted). Merchantability means, among other things, that goods "[a]re fit for the ordinary purposes for which [they] are used." Haw.Rev.Stat. § 490:2–314(2)(c); [15] *Ontai*, 66 Haw. at 250, 659 P.2d at 744. In a breach of implied warranty of merchantability claim, the plaintiff must show that "(1) the seller is a merchant of such goods; and (2) the product was defective or unfit for the ordinary purpose for which it is used." *Nielsen v. Am. Honda Motor Co., Inc.*, 92 Hawai'i 180, 190, 989 P.2d 264, 274 (Haw. Ct.App.1999).

The Court begins its discussion by addressing the custom product exception advanced by Defendant. Relying on out of

---

**15.** Hawaii Revised Statutes ("HRS") § 490:2–314 provides:

(1) Unless excluded or modified (section 490:2–316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the · serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

(2) Goods to be merchantable must be at least such as:

(a) Pass without objection in the trade under the contract description; and

(b) In the case of fungible goods, are of fair average quality within the description; and

(c) Are fit for the ordinary purposes for which such goods are used; and

(d) Run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e) Are adequately contained, packaged, and labeled as the agreement may require; and

(f) Conform to the promises or affirmations of fact made on the container or label if any.

(3) Unless excluded or modified (section 490:2–316) other implied warranties may arise from course of dealing or usage of trade.

Haw.Rev.Stat. § 490:2–314

state/circuit cases, Defendant contends that the implied warranty of merchantability did not attach because the feed was a custom product. *Price Bros. Co. v. Philadelphia Gear Corp.,* 649 F.2d 416, 424 (6th Cir.1981) (holding that no warranty of merchantability could arise from a sale of components to be installed in a highly complex piece of machinery because the components had never been used in machinery of that type and the machinery itself was new and had never been operated; under such circumstances, no usual standards for determining ordinary performance could be determined); *Norcold, Inc. v. Gateway Supply Co.,* 154 Ohio App.3d 594, 798 N.E.2d 618, 624–25 (2003) (holding that granting of summary judgment was proper as to breach of implied warranty of merchantability claim because the product at issue was a newly created component made especially for the plaintiff and " 'no average or usual standards for determining ordinary performance or quality for the components c[ould] be determined' because the parts had never previously been manufactured"). The Court does not refute that these cases stand for the propositions for which Defendant has cited them. However, they are inapplicable and distinguishable. For one, the Hawaii courts have not adopted the custom product exception, and the Court believes that it would be inappropriate to consider said exception in the present case.

■■ Second, even if the Court were to consider the custom product exception, it would find that the exception does not apply. The basis for the rulings in the cases cited by Defendant was that there were no usual standards for determining ordinary performance in the new products. Given the facts presented here, the Court could not reach the same conclusion as those cases. The Kona Pacific poultry meal feed was not a newly creat-

ed feed made especially for Plaintiff; it was created in 2007 for Kona Blue and had been sold for over two years by the time Plaintiff assumed control of the aquafarm. Arguably then, usual standards for determining ordinary performance could be ascertained.

■■ In view of the inapplicability of the custom product exception, the issue is whether Defendant is entitled to summary judgment based on the evidence before the Court. The answer is clearly no. There is a genuine issue of material fact concerning the second element of this claim-whether the feed was defective or unfit for the ordinary purpose for which it was used. Accordingly, the Motion is denied as to Plaintiff's breach of implied warranty of merchantability claim.

In a footnote, Defendant also argues that Plaintiff cannot prevail because it is undisputed that the feed was merchantable given Plaintiff's resale of the excess Kona Pacific feed to other farmers. Plaintiff clarifies that it did not resell the feed to Seriola commercial farmers; it sold the feed to Kona Blue for a research trial, an agricultural management/consulting service company, and a hotel and pond service company. Pl.'s CSF at ¶ 34. The Court rejects Defendant's argument because "[t]he right of a buyer to bring suit against a seller for breach of an implied warranty of merchantability is not affected by the fact that the former has resold the goods to a third party." 26 Am.Jur. Proof of Facts 2d 1. Thus, summary judgment is improper.

**V. *Implied Warranty of Fitness for a Particular Purpose***

**A. *Disclaiming Language on the Product Sheet***

Defendant's first argument is that Plaintiff's breach of implied warranty for a par-

ticular purpose claim fails because it disclaimed the warranty on its product sheets. Plaintiff counters that there is no disclaimer language in the contract and any language on the product sheets does not count because the product sheets were not incorporated into the contract. Even if the product sheet was incorporated into the contract, Plaintiff asserts that the product sheet did not contain a disclaimer because the statement is in small font at the bottom of the page and is not conspicuous.

 The implied warranty of fitness for a particular purpose is narrower and more specific than the implied warranty of merchantability. *Ontai*, 66 Haw. at 250, 659 P.2d at 744 (citation omitted). "[T]he essential components of an implied warranty of fitness are that the seller has reason to know of the particular purpose for which the goods are required, and that the buyer relies on the seller's expertise in supplying a suitable product." *Id.*; Haw. Rev.Stat. § 490:2–315.[16] To establish a breach of implied warranty for fitness of purpose claim, a plaintiff must prove that: "(1) the plaintiff desired a product for a particular purpose; (2) the defendants had reason to know about this purpose; and (3) the product sold to the plaintiff failed to meet that purpose." *Neilsen*, 92 Hawai'i at 191, 989 P.2d at 275. "Whether or not

[the implied warranty of fitness for purpose] arises in any individual case is basically a question of fact to be determined by the circumstances of the contracting." *Ontai*, 66 Haw. at 250, 659 P.2d at 744.

 The implied warranty of fitness may be disclaimed as long as it is in writing and conspicuous.[17] Haw.Rev.Stat. § 490:2–316(2) ("(2) Subject to subsection (3), . . . to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that 'There are no warranties which extend beyond the description on the face hereof.'."). Warranty exclusions are authorized so that parties may bargain to allocate the risk of loss. *Sierra Diesel Injection Serv., Inc. v. Burroughs Corp., Inc.*, 890 F.2d 108, 113 (9th Cir.1989). Exclusions of warranties are generally disfavored, and standardized take it or leave it form contracts are construed against the drafter, "subject to the general obligation of good faith and of not imposing unconscionable terms upon a party." *Id.* (citing Rest. (Second) of Contracts § 211). HRS § 490:2–316 "seeks to protect a buyer from unexpected and unbargained language of disclaimer by denying effect to such language when inconsistent with language of express warranty

---

16. HRS § 490:2–315 provides:

Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose. Haw.Rev.Stat. § 490:2–315.

17. "Conspicuous"

means so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it. Wheth-

er a term is "conspicuous" or not is a decision for the court. Conspicuous terms include the following:
(1) A heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same or lesser size; and
(2) Language in the body of a record or display in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from surrounding text of the same size by symbols or other marks that call attention to the language. Haw.Rev.Stat. § 490:1–201.

and permitting the exclusion of implied warranties only by conspicuous language or other circumstances which protect the buyer from surprise." Haw.Rev.Stat. § 490:2–316, comment 1.

In the present case, Defendant's disclaimer is not "conspicuous" as defined by HRS § 490:1–201.[18] Subparagraphs (1) and (2) in HRS § 490:1–201 describe methods for calling attention to terms. Haw. Rev.Stat. § 490:1–201, comments. However, the test "is whether attention can reasonably be expected to be called to it. The statutory language should not be construed to permit a result that is inconsistent with that test." *Id.*

Defendant's disclaiming language is at the bottom of the product sheet, in the same font as the main text, but smaller. Moreover, there is no heading separating it from the text above.[19] Def.'s CSF, Ex. A, Ex. 804 at KBDD–198130. Defendant relies on an out-of-district case, *Fargo Machine & Tool Co. v. Kearney & Trecker Corp.*, 428 F.Supp. 364 (E.D.Mich.1977), for the proposition that a small print disclaimer is conspicuous when provided on a single sheet with minimal other text. That case is inapposite. The *Fargo Machine* court's ruling was not based simply on

whether the visual appearance of a provision of the terms and conditions attached to a purchase order was sufficiently conspicuous; it considered a number of factors in determining whether the disclaimer satisfied U.C.C. § 2–316 (identical to HRS § 490:2–316), one of which was the appearance of the disclaiming language. The disclaiming language was bold titled "WARRANTY OF MATERIAL AND WORKMANSHIP," it was only one of fourteen separate sections on a single page, and it was the only one dealing with a warranty provision. *Fargo*, 428 F.Supp. at 372; *see also, e.g., Strojny v. PermaDri, Inc.*, Civil No. 11–00131 LEK–KSC, 2012 WL 4718099, at *14 (D.Haw. Sept. 20, 2012) (finding that the limited warranty provision on the product label was conspicuous).[20]

The disclaimer at issue here contains no such heading or distinctive font to call attention to it. As a result, the Court finds that it is not conspicuous. *Office Supply Co., Inc. v. Basic/Four Corp.*, 538 F.Supp. 776, 784 (D.C.Wis.1982) (finding that disclaimers were not conspicuous because they were on the reverse side of the first two pages of the contract; they were not positioned near the buyer's signature

---

**18.** Plaintiff argues that conspicuousness requires that language "make plain that there is no implied warranty" by using expressions such as "as is" or "with all faults," and that such "magic words" must be used. Plaintiff is manufacturing requirements that do not exist. HRS § 490:2–316(a)(3) provides: "Unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like 'as is', 'with all faults' *or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty.*" Haw.Rev.Stat. § 490:2–316(a)(3) (emphasis added). In other words, the disclaimer need not be limited to these "magic words"; other language may suffice.

**19.** Because the copy presented to the Court is in black and white, the Court cannot discern whether the disclaimer language is a different color that the other text. Even if the disclaimer language was in a different color, it would not become conspicuous because the size of the text would need to be the same or larger than the surrounding text.

**20.** The disclaiming language was in a column by itself (the remainder of the text on the label was in a separate column), in equal or larger size font than the other text on the label of the product, portions of the language were capitalized, and the language contained the bold, capitalized heading "LIMITED WARRANTY." *Strojny*, Civil No. 11–00131 LEK–KSC, Doc. No. 36, Ex. B to Ex. 1. No such factors exist here.

line; the print, though italicized, only slightly contrasted with the remainder of the contract; and there were no headings).

The Court's inquiry does not end there, however.

Whether a disclaimer is conspicuous is not simply a matter of measuring the type size or looking at the placement of the disclaimer within the contract. A reviewing court must ascertain that a reasonable person in the buyer's position would not have been surprised to find the warranty disclaimer in the contract. *Sierra Diesel,* 890 F.2d at 114; *Va. Sur. Co., Inc. v. Am. Eurocopter Corp.,* 955 F.Supp. 1213, 1217 (D.Haw.1996). Factors to be considered are the sophistication of the parties and the circumstances of the negotiation and signing. *Id.* Notably, as Plaintiff has pointed out, there is no dispute that the product sheets were not part of the contract. Defendant contends that there is no requirement that disclaimers need to be incorporated into a contract. Yet, nearly all of the cases it relies upon involved a disclaimer in a contract.[21] In *Fargo Machine,* for example, the disclaimer was one of the sections in the terms and conditions attached to the purchase order. *Fargo Mach.,* 428 F.Supp. at 371–72. The Court's decision turned on the following: the sophistication of the buyer experienced in commercial dealings; the equal bargaining position of the parties given that the buyer had changed provisions which had

been unacceptable to it; the language itself was clearly and conspicuously designated as a warranty; and the buyer's president testified that he knew of the warranty paragraphs, had read them, and was familiar with the contents. *Id.* at 372; *Velez v. Craine & Clarke Lumber Corp.,* 41 A.D.2d 747, 748, 341 N.Y.S.2d 248 (N.Y.App.Div.1973), *reversed by* 33 N.Y.2d 117, 350 N.Y.S.2d 617, 305 N.E.2d 750 (1973) (disclaimers appear on invoice); *FMC Fin. Corp. v. Murphree,* 632 F.2d 413, 419 (5th Cir.1980) (disclaimer was a section of the lease agreement); *see also Strojny,* 2012 WL 4718099, at *14 (considering whether the limited warranty provision on the label of the container became part of the parties' agreement and ultimately holding that material issues of fact existed to preclude a finding that 1) the provision precluded the plaintiffs' claims and 2) the provision is inapplicable or otherwise invalid); *Office Supply,* 538 F.Supp. at 783–84 (disclaimers were in the contract); *O'Neil v. Int'l Harvester Co.,* 40 Colo.App. 369, 575 P.2d 862, 864 (1978) (warranty was disclaimed in the contract); *Rehurek v. Chrysler Credit Corp.,* 262 So.2d 452, 454–55 (Fla.Dist.Ct.App.1972); *Imperial Stamp and Engraving Co., Inc. v. Bailey,* 82 Ill.App.3d 835, 38 Ill.Dec. 206, 403 N.E.2d 294, 297 (1980); *Christopher v. Larson Ford Sales, Inc.,* 557 P.2d 1009, 1012–13 (Utah 1976); *cf. LaBella v. Char-*

***

**21.** Defendant cites *D.O.V. Graphics, Inc. v. Eastman Kodak Co.,* 46 Ohio Misc. 37, 347 N.E.2d 561 (Ohio Ct.Com.Pl.1976), for the proposition that courts have enforced disclaimers for products that were not specifically incorporated into a contract. D.O.V. involved a disclaimer that was printed on each package of paper delivered, and which had to be cut open. *Id.* at 562. The *D.O.V.* court ultimately concluded that the contract between the parties included the limitation of liability. *Id.* at 563. The court reasoned that while there was no evidence that the limita-

tion of liability was negotiated, the plaintiff knew the use of the paper and that the defendant's liability was limited to replacing the defective paper. The court held that the contract for the allegedly defective paper "consisted of plaintiff's order for paper knowing that defendant was limiting his liability for any commercial damages flowing therefrom and its acceptance of the package of paper on which such limitation of liability was set forth." *Id.* Thus, the court made a determination that the disclaimer on the package of paper delivered became part of the contract.

*lie Thomas, Inc.*, 942 S.W.2d 127, 132–33 (Tex.App.1997) (disclaimer in a lease).

Not only does the majority of case law involve contracts, but a finding of conspicuousness often involves undisputable evidence, generally in the form of testimony, that a buyer has seen and understood the disclaimer.[22] *Office Supply*, 538 F.Supp. at 784 (deposition testimony from the buyer's president that he spent two months comparing the purchased system with other systems; that he drew up written comparisons between systems, including guarantees; that he read the contract prior to signing it; when he received the contract, he made a list of questions, one of which involved the guarantee; before he signed the contract, he showed the warranty provision to someone; and he discussed the warranties with the seller before signing the contract and tried to have them modified, which established that the warranty disclaimers were neither unexpected nor unbargained for); *Fargo Mach.*, 428 F.Supp. at 371–72; *Velez*, 41 A.D.2d at 748–49, 341 N.Y.S.2d 248 (the job superintendent had actual knowledge of the presence of the disclaimer of warranty of fitness; he had dealt with the defendant for 15 or 16 years and had in his 20 years of experience in the trade seen many invoices; moreover, the disclaimer was placed opposite the total amount of the bill and placed under a conspicuous legend and word "NOTE" which called attention to it).

■ Without reaching the issue of whether the product sheet became part of the agreement, the Court finds that the evidence does not clearly establish that Mr. Madsen read and knew about the disclaimers, at the time the parties entered into the contract, even though Kona Blue produced the product sheets as part of Plaintiff's due diligence. In his position as president, Mr. Madsen should arguably have a fairly high level of sophistication in business dealings. Nevertheless, bearing in mind that exclusions are generally disfavored, and viewing the evidence in the light most favorable to Plaintiff, the Court concludes that Defendant has not presented sufficient evidence demonstrating that Plaintiff was aware of the disclaimer. Even if Plaintiff was aware of the disclaimer, the disclaimer itself is not conspicuous. Accordingly, considering the physical appearance of the disclaimer, the sophistication of the parties, and the circumstances of the negotiation and signing, the Court declines to find that Defendant disclaimed the implied warranty of fitness.

### B. *Reliance by Plaintiff on Defendant's Expertise*

Defendant's second argument for granting summary judgment is that Plaintiff did not rely on Defendant in determining whether the feed was appropriate for the fish; that Plaintiff selected the feed based on Kona Blue's success. Plaintiff represents that it relied on Defendant's expertise to create a feed that met *Seriola rivoliana's* nutritional requirements. Based on the evidence submitted by the parties, a genuine issue of material fact exists as to whether Plaintiff relied on Defendant's expertise in supplying a suitable product.

Mr. Madsen attests that he "relied on [Defendant's] global expertise and skill in formulating fish feed in deciding to continue to purchase the Kona Pacific feed

---

**22.** Defendant further argues that actual knowledge obviates any need for conspicuousness. However, the cases cited by Defendant did not turn solely on actual knowledge; the courts there also found that the appearance of the disclaimers, which were included in contrast, were conspicuous. *FMC Fin.*, 632 F.2d at 419; *Fargo Mach.*, 428 F.Supp. at 371–72. This Court has determined that the disclaiming language on the product sheets is not, considering its appearance, conspicuous.

from [Defendant]." Pl.'s CSF, Decl. of Todd Madsen ("Madsen Decl.") at 16. He further explains that he was aware of Defendant's expertise through websites, advertisements, the product sheet, and discussions with Kona Blue. *Id.* Defendant focuses on the fact that it did not make feed recommendations to Plaintiff. However, Plaintiff is not required to demonstrate that Defendant recommended the feed to Plaintiff. The issue is whether Plaintiff relied on Defendant's "skill or judgment to select *or furnish* suitable goods." Haw.Rev.Stat. § 490:2–315 (emphasis added); *Ontai*, 66 Haw. at 250, 659 P.2d at 744. Mr. Madsen claims that he did. Thus, drawing all inferences in favor of Plaintiff, as it must, the Court accepts Mr. Madsen's statement as true for the purposes of this Motion, and finds that it creates a genuine issue of fact precluding summary judgment on Plaintiff's implied warranty of fitness for purpose claim.

## VI. *Unjust Enrichment*

Defendant seeks dismissal of Plaintiff's unjust enrichment claim because there is an express contract between the parties. Plaintiff counters that if the Court finds that Plaintiff does not have an adequate remedy of breach of an implied warranty, then clear issues of fact exist about whether Plaintiff conferred a benefit upon Defendant and whether Defendant's retention of the benefit would be unjust.

■ "To prevail on an unjust enrichment claim, a plaintiff must show that: 1) it has conferred a benefit upon the defendant, and 2) that the retention of the benefit was unjust." *State Farm Fire and Cas. Co. v. Chung*, 882 F.Supp.2d 1180, 1192 (D.Haw.2012) (citation omitted). It is well settled "that equitable remedies are not available when an express contract exists between the parties concerning the same subject matter." *AAA Haw., LLC v.*

*Haw. Ins. Consultants, Ltd.*, CV. No. 08–00299 DAE–BMK, 2008 WL 4907976, at *3 (D.Haw. Nov. 12, 2008) (citations omitted); *Chung*, 882 F.Supp.2d at 1192 ("As a general rule, '[a]n action for unjust enrichment cannot lie in the face of an express contract.' "). Thus, "[w]here the parties to a contract have bargained for a particular set of rights and obligations, all claims involving those express rights and obligations properly lie in contract law and not in equity." *AAA*, 2008 WL 4907976, at *3.

Here, there is no dispute that there is a contract between the parties. Def.'s CSF at ¶¶ 9, 10, 43; Pl.'s CSF at 2 & ¶¶ 9, 10. Because Plaintiff's allegation that it "conferred a benefit upon Skretting by purchasing Kona Pacific feed and making payment to Skretting," First Amend. Compl. at ¶ 54, arises solely out of the express contract for the sale of the feed, Plaintiff cannot maintain an unjust enrichment claim.

## VII. *Breach of Contract Counterclaim*

■ Defendant lastly argues that it is entitled to summary judgment on its breach of contract counterclaim in the amount of $34,654.40 because it is undisputed that Plaintiff failed to pay for the high fishmeal feed that it admitted was satisfactory. To prevail on a claim for breach of contract, Defendant/Counterclaim Plaintiff must identify "(1) the contract at issue; (2) the parties to the contract; (3) whether [Defendant/Counterclaim] Plaintiff performed under the contract; (4) the particular provision of the contract allegedly violated by [Plaintiff/Counterclaim] Defendant[ ]; and (5) when and how [Plaintiff/ Counterclaim] Defendant[ ] allegedly breached the contract." *Evergreen Eng'rg, Inc. v. Green Energy Team LLC*, 884 F.Supp.2d 1049, 1059 (D.Haw.2012).

■ Plaintiff contends that there are material issues of fact as to whether De-

fendant materially breached the agreement, specifically whether it breached its contractual obligation by providing defective feed. Plaintiff believes that Defendant's material breach of the contract justifies its non-performance. These arguments are not well taken.

Based on the evidence before the Court, there was a valid contract between the parties for the Kona Pacific *high fishmeal* feed, Defendant delivered the feed, and Plaintiff failed to pay for the feed. Def.'s CSF, Beattie Decl. at ¶ 16 & Ex. J; Johnson Decl., Ex. R. Mr. Madsen has admitted that the high fishmeal feed was sufficient, but that Plaintiff did not pay for the feed because it had paid millions of dollars for defective feed.[23] *Id.,* Johnson Decl., Ex. R. Defendant did not materially breach the contract for the high fishmeal feed. Consequently, whether or not the Kona Pacific poultry meal feed was defective is irrelevant and does not create an issue of material fact that would preclude summary judgment. The poultry meal feed is not the subject of the contract identified in this counterclaim. Accordingly, Defendant is entitled to summary judgment on its counterclaim.[24]

### CONCLUSION

Based on the foregoing, the Court HEREBY GRANTS IN PART AND DENIES IN PART Defendant's Motion for Summary Judgment and DENIES AS MOOT 1) Defendant's Supplemental Motion for Summary Judgment on the Doctrine of Res Ipsa Loquitur and Any Similar Theories and 2) Plaintiff's Motion for Partial Summary Judgment Re: Circumstantial Evidence Under Strict Products Liability ("Quasi"—*Res Ipsa* ).

Defendant's Motion is granted as to Plaintiff's negligence (Count 1), intentional/negligent misrepresentation (Counts 2 and 3); products liability (Count 4), and unjust enrichment claims (Count 7), and Defendant's breach of contract counterclaim. Defendant's Motion is denied as to Plaintiff's implied warranty of merchantability (Count 5) and implied warranty of fitness claims (Count 6).

IT IS SO ORDERED.

---

**23.** This argument rests in part on Plaintiff's treatment of the last contract for the high fishmeal feed as one of many installments. Haw.Rev.Stat. § 490:2–612(3) ("Whenever nonconformity or default with respect to one or more installments substantially impairs the value of the whole contract there is a breach of the whole. But the aggrieved party reinstates the contract if he accepts a nonconforming installment without seasonably notifying of cancellation or if he brings an action with respect only to past installments or demands performance as to future installments."). HRS § 490:2–612 is inapplicable because the contract at issue was not the same as the previous contract for poultry meal feed. Moreover, Plaintiff accepted the feed and this action pertains to alleged defects with the poultry meal feed, which were the subject of the prior "installment contracts."

**24.** Plaintiff submits that this issue should be decided by a jury when it decides whether the money paid for the defective feed should be returned. The Court disagrees. Whether or not Defendant is ultimately held liable and Plaintiff is awarded damages does not preclude summary judgment when no genuine issues of material fact exist. Issues of set off may be addressed if and when they arise.